McAUSLAND *v.* PUNDT.

## McAusland v. Pundt.

1. DERIVATIVE TITLES. Although it may be true as an abstract proposition that a derivative title cannot be better than that from which it is derived, yet there are many necessary exceptions to the operation of the rule.

2. JUDICIAL TITLE: *Not defeasible.* A party who has recovered a judgment or decree, under which his adversary's property has been sold to him, holds an estate which is not merely defeasible upon a reversal of the judgment or decree by an appellate court.

3. ———: *Why restored on reversal.* The principle upon which the property so sold, remaining in the hands of such party at the time of reversal, is returned to the former owner, is that of convenience in doing justice between the parties.

4. ———: *Not restored when held by grantee.* If a party who has recovered a judgment or decree becomes the purchaser of property thereunder, and conveys the same to a third party, and afterwards, the judgment and decree not having been superseded by bond, is reversed in the appellate court, such grantee will retain the property notwithstanding the reversal.

5. ———: *When party thereto retains property.* And so will the party if he retain the property at the time of the reversal. Per CROUNSE, J.

6. WHEN VENDEE CAN DISPUTE HIS VENDOR'S TITLE. The rule, that a tenant or a vendee in possession under a contract, cannot deny the title under which he entered, is confined to the title of the landlord, or of the vendor, at the time possession was given.

7. ———. If the law avoid that title, the tenant or vendee may disclaim it and take under him to whom it is adjudged.

8. SPECIFIC PERFORMANCE: *Gross negligence.* Specific performance of a contract for the sale of real estate will not be decreed when the vendee has been guilty of gross negligence in the performance of his stipulations.

9. ———: *Excuses.* Such neglect is not excusable, on the ground that the title was involved in dispute, if the dispute existed when the contract was made, and an unfavorable determination was provided against by security taken and stipulations made at the time for the vendee's protection.

This was an appeal from a decree rendered by Mr. Justice CROUNSE, sitting in the District Court, for Douglass county.

McAUSLAND v. PUNDT.

The case will appear, from the allegations of the bill, as follows : "That on and before the twenty-eighth day of May, A. D. 1859, William M. Jones was seized to himself and his heirs of a certain piece or parcel of land, situate in the city of Omaha, and known and described as follows: the west two-thirds of lot number five (5), in block number one hundred and twenty-one (121).

And your orator further shows that the said Jones, being desirous to dispose of the said real estate, entered into an agreement with John Hughes, then of said city, now of the kingdom of England, for the sale thereof to him, which agreement was reduced to writing, and signed by the said Jones and the said Hughes, to the purport and effect that the said Jones should, by good and sufficient deed of conveyance, containing a covenant of warranty by him duly made, executed and acknowledged, convey the said estate to said Hughes, in fee ; and that thereupon the said Hughes should pay therefor to him, the said Jones, the sum of two thousand dollars, and that in the meanwhile, and until the making of said deed, the said Hughes should pay to said Jones, for the use and occupation of the said premises, the sum of three hundred dollars per annum ; and that the said Hughes, on the said day, and under the said agreement, entered into the said premises, and thence until the day in that behalf hereinafter mentioned, continued in the possession thereof.

And your orator further shows unto your honor, that on and after the thirtieth day of May, in the year aforesaid, Henry R. A. Pundt and Charles W. Koenig, were seized in common to themselves and their heirs, of a certain piece or parcel of land, situate in the said city of Omaha, and known and described as follows: the west one-third of lot number five, in block number one hundred and four, and were desirous to exchange the same for a certain portion of the premises first above described, that is to say : so much

McAUSLAND *v.* PUNDT.

thereof as is twenty-two feet front on Farnham street, and eighty-eight feet deep on Thirteenth street ; that, accordingly on said day, the said Pundt and Koenig entered into an agreement with the said John Hughes for the said exchange, which agreement was reduced to writing, and signed by the said Hughes, and Pundt, and Koenig, to the purport and effect that the said Hughes should, at such time as he should obtain the title thereto, by a good and sufficient deed of conveyance, convey to said Pundt and Koenig in fee, with covenants of warranty, the above described part of lot five, in block one hundred and twenty-one ; and the said Pundt and Koenig, beside certain other considerations by them to be paid thereof, should convey to said Hughes in fee, the said west third of lot five, in block one hundred and four ; and thereupon and under, and in virtue of the said agreement, the said Pundt and Koenig entered into and have ever since occupied the said part of said lot five, in block one hundred and twenty-one.

And your orator further shows unto your honor, that on the ninth day of July in the said year, the said Hughes entered into an agreement with your orator for the sale to him of the said lot secondly above described, which agreement was reduced to writing and signed by said Hughes, and your orator, to the purport and effect, that the said Hughes had sold, and when your orator should pay the notes hereinafter mentioned, would execute a good and sufficient deed of warranty of said premises, free and discharged of all incumbrances, to your orator, and that your orator gave to said Hughes his three several promissory notes, each for the sum of one hundred and sixty-six dollars and sixty-seven cents, with interest at the rate of ten per cent per annum, and payable respectively in one, two and three years from the date thereof ; and your orator in and by the said articles agreed to pay all taxes on said

premises as long as he held possession of said premises, or any other person held possession thereof under him ; and that in case he failed to pay any one of said notes, then that the said Hughes, or his assigns, might declare all thereof due, and foreclose the said article as a mortgage, and that the said article should, by all the courts of this Territory be, in case of foreclosure, construed as a mortgage. And the said Pundt and Koenig delivered the possession of said premises to your orator, as thereunto entitled under the said agreement, and your orator has ever since so held possession of and occupied the said premises, and has erected thereon a building at an expense and of the value of one thousand dollars, which your orator has occupied and does occupy for mechanical and mercantile purposes. And your orator further shows unto your honor, that on the tenth day of July, A. D. 1862, the said Hughes, for the consideration to him therefor duly paid, of eight hundred dollars, sold to John I. Redick and Clinton Briggs, both of the city of Omaha, the lands first above described, and also among others, the aforesaid contract between him, the said Hughes and your orator ; and the said notes, so as aforesaid by your orator to said Hughes made, and on said day by their certain deed of conveyance bearing date on said day, he, the said Hughes, and Eliza, his wife, conveyed to said Redick and Briggs the same premises, and also sold and assigned to them " all the money, rights and credits of every description, belonging to them or either of them, or due to them or either of them, from any person or persons, or company of persons, in said Territory," including said agreement and said notes. And your orator further shows unto your honor, that on the 14th day of March last past, the said John I. Redick and Clinton Briggs, purchased the first above described premises from the aforesaid William M. Jones, and that on the said day, by a deed by him duly made, executed and acknowledged,

the said Jones conveyed the same to the said Redick and Briggs, in fee forever. And your orator further shows unto your honor, that on or about the eleventh day of October, A. D. 1863, the aforesaid Charles W. Koenig departed this life intestate, leaving Gustavus H. W. Koenig, his son, and Eleonora, his wife, his sole heirs at law him surviving. And your orator further shows unto your honor, that recently — but at what day your orator is not informed and cannot state — the said Redick and Briggs of the one part, and the said Pundt and Eleonora Koenig, and Gustavus H. W. Koenig, of the other part, executed between themselves the afore-mentioned agreement between the said Hughes and the said Pundt and Koenig; and the said Redick and Briggs, by their deed of conveyance by them duly made, executed and acknowledged, conveyed to the said Pundt, all the undivided one-half of that certain piece or parcel of land, being the part of the said lot five in block one hundred and twenty-one, which is twenty-two feet on Farnham street and eighty-eight feet on Thirteenth street, and in like manner conveyed to the said Eleonora Koenig all the other undivided half of said premises, and thereupon by same conveyance or conveyances, writing or writings, the nature whereof is to your orator unknown, the said Redick and Briggs acquired and now hold, or are entitled to have from said Pundt, and the heirs of said Koenig, the legal title to the west one-third of said lot five in block one hundred and four.

And your orator further shows unto your honor, that on the 14th day of February, 1859, Charles W. Green, Jonas W. Green, George H. Gill and Charles J. Gill exhibited in this honorable court their certain bill of complaint, impleading therein the aforesaid William M. Jones and one Franklin W. Brown, and alleging divers judgments by them recovered at law against the said Brown; and that the said Brown had caused the title to the lands first afore-

said described to be conveyed to the said Jones, notwithstanding he, the said Brown, was the real owner thereof, in order to place the same beyond the reach of his creditors; and praying that it be declared by the decree of this honorable court that said Jones held said premises in trust for the creditors of said Brown, and that it be ordered and decreed that the same be sold and the proceeds applied to pay the said judgments ; that such proceedings were had in said court on said bill ; that on the twenty-fifth day of January, A. D. 1861, a decree was by said court rendered according to the prayer of said bill ; that afterwards such further proceedings were had on said decree ; that on the eleventh day of June, in the year last aforesaid, a decree was, by the honorable Supreme Court of this Territory made, affirming the decree of this honorable court ; and afterwards and at the term of December, A. D. 1863, a decree was, by the honorable Supreme Court of the United States made, reversing the two decrees aforesaid, and dismissing the aforesaid bill of complaint.

And your orator further shows unto your honor, that on the 13th day of May, A. D. 1861, under and in pursuance of the decree first aforesaid made, John C. Hileman, Esq., sheriff of the said county of Douglass, did duly sell at public auction to the aforesaid Charles W. Green, so much of the said premises as is twenty-two feet front on Farnham street, and eighty-eight feet on Thirteenth street ; and at the same time and under and by virtue of the same authority, did sell the remainder of said premises to one James M. Woolworth; that having reported his proceedings on said sale to this honorable court, a decree was, by said court, at its term of April in said year, duly made confirming said sale, and directing said sheriff to convey, by his deed in due form of law, the two several parts aforesaid of said premises to the purchasers thereof respectively,

which was by said sheriff, on the 14th day of August in said year, accordingly done.

And your orator further shows unto your honor, that such further proceedings were, by said Supreme Court of this Territory had, on the last aforesaid order and decree; that at the term of December last past, the said order and decree were, by its decree in that behalf, affirmed; that throughout all the above recited proceedings the said Redick was, and from the rendition of the first aforesaid decree, the said Redick and Briggs were the solicitors therein, as well of said Hughes, as of said Jones, and were the general counsellors and agents of said Hughes in respect of all his affairs, business and interests in this Territory.

And your orator further shows unto your honor, that on the 11th day of March, A. D. 1862, the aforesaid Charles W. Green, by his deed of conveyance of that date, by him duly made, conveyed to the aforesaid H. R. A. Pundt and Charles W. Koenig, since deceased, the part of said premises said Green had purchased as aforesaid; and that recently, but at what date your orator is not informed and is unable to state, the aforesaid Redick and Briggs, by divers conveyances, acquired the title to the part of the said premises so as aforesaid purchased by said Woolworth.

And your orator further shows unto your honor, that he has been ready and willing to pay the notes, and each thereof, by him to said Hughes made, in payment for the said premises known as the west one-third of lot five, in block one hundred and four, when the same became due, and at all times since that time; and has during said period had and retained in his possession, ready to be applied thereto, the amount of said notes; that shortly after making said notes the said Hughes left, and has ever since been absent from this country; that until within ten days last past your orator has not known to whom the said Hughes entrusted said notes, or in whose hands the same at any time were,

and for that reason has not offered to pay the same, but now and hereby tenders to the aforesaid Redick and Briggs, whom he charges to be the owners and holders of said notes ; or if it shall appear that they are not the owners and holders of said notes, then he tenders to the holder and owner thereof, whoever he shall appear to be, the sum both for principal and interest which is due on said notes. And your orator says that he has at all times since he so as aforesaid entered into said lots,. well and truly paid all taxes levied or assessed on said premises."

The contracts on which the rights of the parties depend are as follows :

I. Article of agreement made and entered into this 28th day of May, in the year of our Lord one thousand eight hundred and fifty-nine, between William M. Jones, of the State of Indiana, of the first part, and John Hughes, of the city of Omaha, of the second part, witnesseth : that the said party of the first part for himself, heirs, executors and administrators, doth hereby covenant and agree to and with the said party of the second part, his heirs, executors and administrators, that he will sell and convey, as hereinafter mentioned, to the said party of the second part, all that certain piece or parcel of land situate and being in the county of Douglass and city of Omaha, known and described as the west forty-four (44) feet of lot number five (5), in block number one hundred and twenty-one (121). The said party of the second part for himself, heirs, executors and administrators, does hereby covenant and agree, that he will well and truly pay, or cause to be paid to the said party of the first part, his heirs, executors, administrators or assigns, without fraud or delay, the just sum of two thousand dollars to be paid to the said William M. Jones at any time he, said Jones, shall execute and tender to the said party of the second part, at the office of Sahler & Co., in the city of Omaha, a good and sufficient warranty deed of said

McAUSLAND v. PUNDT.

premises. It is further agreed between the parties that the party of the second part agrees to pay the said Jones rent for said premises therein described, at the rate of three hundred dollars per annum, quarterly in advance, until such time as said deed is executed and tendered to the said party of the second part as aforesaid, and the said sum of two thousand dollars paid therefor as herein agreed; and it is further covenanted by and between the parties aforesaid, that on the performance of all the conditions to be done and performed at the time and manner above mentioned and specified on the part and behalf of the said party of the second part that the said party of the first part shall execute a good and sufficient deed of warranty of the above described premises, free and discharged from all incumbrances to the said party of the second part, his heirs, executors and administrators, subject to all taxes assessed on said premises from and after this date; and the failure or neglect of the said party of the second part to do and perform anything herein specified to be done or performed on his part, the said party of the first part may elect to consider himself released or discharged of and from all liability in any of the covenants to be done and performed on his part; and all payments and improvements made by said party of the second part shall be deemed forfeited; and the said party of the second part does hereby release and discharge the said party of the first part from all claims and demands for said payments and improvements, any law or statute to the contrary notwithstanding.

In witness whereof, the said parties hereunto have set their hands and seals the day and year first above written.

WILLIAM M. JONES,
By JOHN I. REDICK,
his attorney in fact.

In presence of          JOHN HUGHES.
JOHN H. SAHLER.

McAUSLAND *v.* PUNDT.

II. "Articles of agreement made and entered into this 30th day of May, in the year of our Lord 1859, between John Hughes, of Omaha City, county of Douglass and Territory of Nebraska, of the first part, and Henry R. A. Pundt and Charles W. Koenig, of the same place and Territory aforesaid, parties of the second part, witnesseth: that the said party of the first part, for himself, his heirs, executors and administrators, does hereby covenant and agree to and with the said party of the second part, their heirs, executors and administrators, that he will sell and convey, as hereinafter mentioned, to the said parties of the second part, the following described lot or piece of land, situate in the county of Douglass, in the city of Omaha, and as known on the lithographed plate thereof, being twenty-two feet (22) on Farnham street by eighty-eight feet (88) on Thirteenth street, off the west side of lot five (5) in block one hundred and twenty-one.

The said party of the first part, further agrees that he will execute a good and sufficient deed of warranty of the above described premises, free and discharged from all incumbrances, as soon as he shall obtain the same, to the said parties of the second part, their heirs, executors and administrators; and the said party of the first part hereby binds himself, and his heirs and executors, in ten thousand dollars as his damages by reason of his not strictly complying with this contract. In consideration of the above, the said parties of the second part agree to pay the said party of the first part the sum of two thousand dollars, in Omaha city scrip, the receipt whereof is hereby acknowledged; and further do hereby covenant and agree to and with the said party of the first part, his heirs, executors and administrators, that they will sell and convey to the said party of the first part the following described lot or piece of land situated in the city of Omaha and Territory aforesaid, and known and described in the lithographed plat thereof,

McAusland *v.* Pundt.

being the west twenty-two (22) feet of lot five (5) in block one hundred and four (104). The said parties of the second part further agree that they will execute a good and sufficient deed of warranty of the last herein described premises, free from all incumbrances, as soon as the said party of the first part fulfills his agreement hereinbefore mentioned; and the said parties of the second part hereby bind themselves and their heirs in ten thousand dollars as damages by reason of their not complying strictly with this contract.

In witness whereof, the said parties have hereunto set their hands the day and year, first above written.

> JOHN HUGHES,
> HENRY R. A. PUNDT,
> CHARLES W. KOENIG.

In the presence of
Cyrus H. Deforest, Jr.,
D. D. Belden.

In consideration of one dollar, to us in hand paid, the receipt whereof is hereby acknowledged, we the undersigned Sahler & Co., and Mrs. Eliza Hughes, hereby guarantee the fulfillment of the above contract on the part of the party of the first part.

In witness whereof, we have hereunto set our hands, the day and year above written.

Attest
D. D. Belden.

SAHLER & CO.,
ELIZA HUGHES.

III. Articles of agreement made and entered into this 19th day of July A. D., 1859, between John Hughes, of Omaha City, in the county of Douglass, Territory of Nebraska, of the first part, and Alexander McAusland of the same county, place and Territory, of the second part, witnesseth: that the said party of the first part for himself, his heirs,

executors, administrators and assigns, doth hereby covenant and agree to and with the said party of the second part, his heirs, executors, administrators and assigns, that he does sell and will convey, as hereinafter named, to the said party of the second part, that certain piece or parcel of land situated in the county of Douglass, in the city of Omaha, and Territory of Nebraska, known and described as follows, to wit: the west twenty-two feet (22) of lot five (5) in block one hundred (104), as surveyed by A. D. Jones, and lithographed by the Council Bluffs and Nebraska Ferry Company. In consideration of the above agreement, the said party of the second part, does give to the said party of the first part his three (3) several promissory notes, each for the sum of one hundred and sixty-six dollars and sixty-seven cents, bearing interest at the rate of 10 per cent per annum, said interest payable annually; said promissory notes being Nos. 1, 2 and 3. Number one running one year, number two running two years, and number three, three years from date. And it is further convenanted and agreed, by and between the parties aforesaid, that on the payment of the three several promissory notes before named, at the time and manner above mentioned and specified, on the part of the said party of the second part, that the said party of the first part, shall execute a good and sufficient, deed of warranty of the within described premises, free and discharged from all incumbrances, to the said party of the second part, his heirs or asigns. And it is further agreed, that in case of failure of the said party of the first part, to make the deed as herein named, the said party of the second part, shall collect of the said party of the first part, his heirs, executors or administrators, the sum of two thousand dollars as damages; and the said party of the second part agrees to pay all taxes assessed upon said premises, as long as he shall hold posession, or any other person holding under or through him.

And the said party of the second part, hereby further

agrees, that in case he shall fail to perform any of his agreements herein mentioned, then the said party of the first part or his asigns, may declare all the remaining payments due ; and the said party of the first part, his heirs, executors, administrators, or assigns, may then foreclose this article as a mortgage, and this article shall be construed as a mortgage by all courts in this Territory in case of foreclosure, as witness our hands the day and year, first above written.

JOHN HUGHES,<br>ALEXANDER McAUSLAND.

In the presence of

CYRUS H. DEFOREST, JR.

The undersigned, Sahler & Co., a firm composed of John H. Sahler and John Hughes, of Omaha city, Douglass county, Nebraska Territory, for and in consideration of one dollar to them in hand paid, the receipt whereof is hereby acknowledged, do hereby guarantee all the agreements of the said party of the first part named in the annexed contract. Witness our hands this 19th day of July, A. D., 1859.

SAHLER & CO.

In presence of

C. H. DEFOREST, JR.

The following deed was also considered material to the rights of the parties :

Know all men by these presents, that we, John Hughes and Eliza Hughes, of Lime Grove, near Manchester, England, in consideration of the sum of eight hundred dollars, in hand paid by John I. Redick and Clinton Briggs, Omaha, Nebraska, do hereby sell and convey and quit claim unto said John I. Redick and Clinton Briggs, all our right, title and interest in and to the following *real* and *personal* property, situated and being in the Territory of Nebraska, to wit : The east twenty-two (22) feet of lot three (3) in blocks

McAUSLAND v. PUNDT.

one hundred and thirty-six, the west forty-four (44) feet of lot five (5) in block one hundred and twenty-one (121), the south half of lot eight (8) in block one hundred and fifteen (115), lot six (6) in block seventy-four (74), lot six (6) in block one hundred and fifty (150), lot seven (7) in block twenty-two (22), lot six in block one hundred and seventy-one (171), lot seven (7) in block eighty-three (83), lots six (6) and seven (7) in block seven (7), all of which lots are situated in the city of Omaha, in Douglas county, Nebraska, and also the west fractional part of the southeast quarter, the southeast fractional part of the northeast quarter, and an east fractional part of the northwest quarter of section five (5) in township thirteen (13) north, range ten (10) east of the sixth principal meridian, and also all other real or personal property which we, or either of us, may have any legal or equitable interest in, in the Territory of Nebraska; and we do also sell and assign to said Redick and Briggs, all the moneys, rights and credits of every description belonging to us or either of us, or due to us or either of us, from any person or persons or company in said Territory, to have and to hold the same unto the said Redick and Briggs, and to their heirs and assigns forever.

Witness our hands and seals the 10th day of July, 1862.

JOHN HUGHES.    [L. S.]

ELIZA HUGHES.    [L. S.]

In presence of

HENRY W. LORD,

CATHARINE BEADLE.

From the decree dismissing the bill, the complainants, in whose behalf the cause had, after the death of their father, the original complainant, been revived, appealed to this court.

*J. M. Woolworth,* for appellant.

McAUSLAND v. PUNDT.

I. Performance of the agreement between Hughes and McAusland would be decreed by the court, if they were the only parties to the controversy.

1. The fact that Hughes did not hold the title to the lot, which he agreed to convey with warranty, and whether he ever could get it being contingent upon the suit between Green and Jones, excused McAusland from paying his notes at their maturity.—*Taylor* v. *Longworth*, 14 *Peters*, 172, 176.

2. The taking from Hughes of the guarantee of Sahler & Co., is not a circumstance indicative of the purposes of the parties, for it was not peculiar to that, but appears also in the other contracts.

3. The contract fixed the rights of McAusland and Hughes, as those of mortgagor and mortgagee, which required a suit of foreclosure, to cut off the rights of the former. The maxim is, *Modus et conventio vincunt legem.*— *Webster* v. *Hoban*, 7 *Cranch*, 399 ; 3 *Parsons on Contr.* 377, *n.* (7.)

II. Redick and Briggs being the grantees and assignees of Hughes, are as much bound by his obligation to convey as he himself is.—2 *Story's Eq. Jr. Sec.* 782–3 ; *Champion* v. *Brown*, 6 *John. ch.* 405–6.

1. They took with notice, and are therefore bound.— *Fitzpatrick* v. *Beatty*, 1 *Gilman*, 454, 468 ; *Ferry* v. *Pfieffer*, 18 *Wis.* 510, 19.

2. They took by assignment from Hughes, instead of by absolute conveyance.

3. And it is not necessary to show any privity between them and us.—2 *Story's Eq. Jr. Sec.* 784, 90, 1212, 13 ; *Laverty* v. *Moore*, 33 *N. Y.* 658, 664.

III. From the point of their first connection with either lot, to the bringing of this suit, Redick and Briggs proceeded as if executing the three several contracts.

[S. C. N.] 15

McAUSLAND *v.* PUNDT.

1. This appears, if regard be had to the order of the transactions to which they were parties.

(1). They first became connected with the property, by the conveyance and assignment to them by Hughes, in 1862, which was pending the suit between Jones and Green.

(2). They took no farther step during the pendency of that suit, because until able to make a good title, Jones could not, by the terms of this contract, be compelled to convey.

(3). When the difficulty in his title was, by the reversal of the decree, avoided, they executed the contract between Hughes and him. This was the next step which they were, by the circumstances, compelled to take. Until then, they could not call on Pundt and Koenig for performance of the contract, with those vendees made by Hughes and by him assigned to them.

(4). Having taken all the necessary steps preliminary thereto, they now execute the contract between Hughes, and Pundt, and Koenig.

(5). And thereby acquiring the premises in question, they call on the original complainant in this suit, to surrender them.

2. The same still farther appears, from the fact that they took from Hughes the instrument proper in such cases, did precisely what he was bound to do, and thereby acquired precisely the advantages to which he, under the several contracts, was entitled.

3. They admit in their answer, and it is clearly in proof, that they settled their conflicting claims between themselves and Pundt and Koenig, with a view to these several contracts, and the reciprocal obligations of the parties thereto.

IV. The sale under the decree of the lot in block 121 to Green, and by him to Pundt and Koenig, is not an element

.McAUSLAND v. PUNDT.

intervening here, which disturbs the rights and duties of the parties, as above demonstrated.

1. The title which Pundt and Koenig took, was divested by the reversal of the decree.

(1). Had Green retained it until the reversal, Jones would have been in, as of his former estate.—*Hubbel* v. *Broadwell*, 8 *Ohio*, 120 ; *McBlain* v. *McBlain*, 15 *Ohio St.* 337; *Waumbaugh* v. *Gates*, 4 *Seld.* 138.

(2). The title being defeasable in Green, was defeasable in Pundt and Koenig.

*a.* And this upon the maxim, that no man can transfer a greater right or interest than he himself possesses.—*Broom's Maxims*, 416.

*b.* The reason for protecting purchasers at judicial sales does not apply.—*Woodcock* v. *Bennett*, 1 *Cow.* 711, 734.

*c.* Nor does the reason for the exception to the maxim, protecting *bona fide* purchasers, apply.—*Boon* v. *Chiles*, 10 *Peters*, 177, 210.

(3). Pundt and Koenig not appearing to have paid any consideration for their purchase, are, as volunteers, entitled to no consideration, to which their grantor would be not entitled.

2. As vendees in possession, under contract with Hughes, and through him under Jones, they could not allege their purchase of the outstanding title, against him or his grantees.—*Galloway* v. *Finley*, 12 *Peters*, 260; *Pintard* v. *Tredgal*, 12 *How.* 26.

(1). The circumstances of the case do not take it out of this rule, for their possession was not threatened, and might not have been, until the outstanding title was avoided by reversal, on the then pending appeal.—1 *Washburn on Real Pr.* 367.

(2). If dissatisfied with Hughes' title, and desirous of taking an adversary title, they were bound to surrender the possession.—*Mattis* v. *Robinson*, 1 *Nebr.* 20.

(3). Jones and Hughes' estate was not determined by the judicial sale, except contingently; and until the contingency were removed, the exception invoked by the appellee, to the rule above referred to, was not applicable.

*E. Wakely,* contra.

I. McAusland cannot compel either Pundt and Koenig, or their assigns, to convey the lot in controversy to him. The agreement of Pundt and Koenig was to convey it, on certain conditions, to Hughes, "his heirs, executors or administrators." (See contract). McAusland is neither the legal representative, nor the assignee of Hughes. Hughes neither conveyed to McAusland his interest in the lot, nor assigned to him his interest in the contract for the conveyance. McAusland claims, under a separate and independent agreement of Hughes to convey, its performance guaranteed by Sahler & Co. To this, Pundt and Koenig were not parties, and should not be involved in controversies growing out of it.

If A. agrees to convey to B. 160 acres of land, and B. agrees to convey different parcels of it to different persons, these persons do not thereby become assignees of B., and cannot maintain action against A. for specific performance. In such case, as in this, the court must determine, not only whether B. has performed his agreement with A., so that A. is bound to convey, but also whether the complainant, as the vendee of B., has performed his agreement with B., and is entitled to a conveyance from him. Such controversies are foreign and not legitimate.

II. If our first position is not sustainable, still it is certain that McAusland cannot compel a conveyance to himself, except on the same terms and conditions as Hughes could have done had he remained the owner of the lot.

It must also be conceded that Redick, or Redick and

Briggs, as the present holders of the title, cannot be compelled to convey it in pursuance of the contract between Pundt and Koenig and Hughes, unless Pundt and Koenig could be so compelled, had they not conveyed the lot.

In other words, conceding that McAusland acquired all the rights of Hughes under his contract with Pundt and Koenig, and that Redick and Briggs became subjected to all the liabilities of Pundt and Koenig, under the same contract, then a conveyance cannot be decreed in this suit, unless it would be decreed if Hughes, having never transferred his interest, had brought the suit against Pundt and Koenig, they never having parted with their title to the lot. Suppose this to be such an action between those parties. Hughes, of course, would have to prove that he had performed on his part, the condition on which Pundt and Koenig were to convey to him the lot in controversy. That is, he would be obliged to show that he had conveyed or caused or procured to be conveyed to them, the 22 by 88 feet of lot five, in block one hundred and twenty-one. Is this fact shown?

The complainant says yes. Before this suit was commenced, Jones, who held the title to the forty-four feet when Hughes made the contract to convey a part of it to Pundt and Koenig, did convey it to John I. Redick, and Redick conveyed the proper part of it to Pundt and Koenig, or to Pundt and the legal representatives of Koenig. They have therefore received the consideration for which they were to deed the lot in controversy to Hughes.

The proofs do show that Pundt and Koenig obtained a title to that part of lot 5, block 121, which Hughes agreed to convey to them; but the vital and controlling question remains, how, from whom, and on what consideration did they obtain the title?

The record answers this question beyond controversy or

McAusland *v.* Pundt.

doubt. Hughes did not convey it to them. He did not procure, or cause, or induce the conveyance. Jones did not convey it to them, although he went through the form of conveying the 44 feet to Redick, and Redick afterwards went through the form of conveying to Pundt and Koenig, the 22 by 88 feet, yet all this was years after Jones had ceased to have any title to or interest in the premises. It was years after Pundt and Koenig had obtained from another source, or in another way, and for a large money consideration paid by themselves, a complete title to the premises. Let us demonstrate this from the record.

On the 14th of February, 1859, Jones held the legal title to the 44 feet of lot 5, in block 121. On that day a creditor's bill was filed against him, and other proper parties, charging that the lot was bought with the money of one Brown, and that Jones held the title in trust for Brown's creditors. On the 15th day of January, 1861, the court decreed that he did so hold it in trust, and that it be sold to pay Brown's creditors. On the 11th day of June, 1861, the Supreme Court of Nebraska affirmed this decree. Meantime, on the 13th day of May, 1861, the sheriff sold the premises. Green, the judgment creditor, bought the 22 by 88 feet, which Hughes had contracted to convey to Pundt and Koenig. James M. Woolworth bought the balance. Subsequently, at the April term, 1861, this sale was confirmed by the District Court, and the sheriff was ordered to deed to the purchasers, and on the 14th of August 1861, did so deed. In December, 1865, the order of confirmation was affirmed by the Supreme Court of Nebraska, so testified to by Woolworth. On the 11th day of March, 1862, as alleged in the bill, Green conveyed the 22 by 88 feet to Pundt and Koenig. If these proceedings operated to vest in Pundt and Koenig a valid title to the premises, it follows undeniably :

1. That they obtained title not from or through or under Hughes, or by his procurement, or aid, or inducement, but by and through a judicial sale which conveyed the title as of a date prior to, and wholly unaffected by, the contract between Jones and Hughes, or any of the subsequent contracts.

2. That when Jones conveyed to Redick, in form, he had no remaining title, and had nothing to convey.

3. That Redick's conveyance to Pundt and Keonig was nugatory and valueless, adding nothing to their existing title.

4. That the nominal conveyance from Jones to Redick, and that from Redick to Pundt and Koenig, were not a performance of the condition, and did not constitute the consideration upon and for which Pundt and Koenig were to deed the lot in controversy to Hughes.

III. The decree of the district court being in force and unreversed when the sale was made, and when it was confirmed, and when Green deeded to Pundt and Koenig, the latter acquired a title unaffected by the subsequent reversal of the decree in the Supreme Court of the United States. 13 *John,* 97 ; 8 *Wend.* 9 ; 1 *Cow.* 734 ; 2 *Hill,* 630 ; 5 *Black,* 328 ; (*Supreme, U. S. Dig.* 2, 728 ; 1 *Smith,* 617 ; 6 *Black,* 466 ; *Eq. Dig. U. S.* 1, 304, 731.

Pundt and Koenig, therefore, on their purchase from Green, were in the same situation, as if the property, when Jones entered into the agreement to convey, had been subject to a mortgage, or to a judgment lien on which it had been afterwards sold ; and by which sale Jones' title had been terminated and absolutely divested, and they had then bought it of the purchaser at the judicial sale. Could Hughes then have compelled them to accept a conveyance from Jones, or from Hughes, and to convey the lot in controversy, in consideration thereof ? At the time of all the contracts and before any of them were executed,

McAUSLAND v. PUNDT.

the suit was pending, in which it was determined that Jones' title was subject to the trust, to satisfy which it was sold. This was constructive notice to all concerned, and they all dealt in view of it, as the contract shows.

IV. The rule that lessee cannot purchase an outstanding or paramount title to defeat his landlord to this case.

1. It does not apply to vendor and vendee.

2. It does not prevent the lessee nor the vendee, if applicable to him, from purchasing the title of the landlord himself or the vendor.

3. The lessee may purchase this title directly from the lessor, or at any judicial sale, as on foreclosure or execution. If, when he leases or afterwards, the premises are subject to mortgage, or to a judgment lien, or a mechanic's lien, or a trust created by the act of the lessor, or by operation of law, and the premises are sold under and by virtue of said mortgage or lien or trust, the lessee may purchase. This is not buying in or setting up an adverse or paramount title. It is a purchase of the very title under which he goes in as lessee or vendee. He gets, by judicial sale, just the title which the deed of the lessor or vendor would have conveyed at the time to which such sale relates. And in this case it relates back to a date prior to all the contracts.—*Taylor's Land and Tenant*, 529; 1 *Wash. Real Prop.* 369, *marg.* 359.

V. If it is demonstrated that Pundt and Koenig, at the time of their conveyance to Redick and Briggs, and after receiving from Redick the nominal conveyance of the 22 by 88 feet in lot five, in block 121, could not have been compelled to convey the lot in suit to McAusland, it seems undeniable that their conveyance to Redick and Briggs could not and did not subject them to the liability to convey. Pundt and Koenig having a title to the lot free from all equities, under the Hughes and McAusland contract, they could convey such title unaffected thereby, They

McAUSLAND *v.* PUNDT.

could sell it or convey it without consideration, or to compromise threatened litigation, or even under a mistaken belief that they could be compelled to convey it. The consideration, the inducement, the motive for the conveyance, are utterly immaterial in this controversy.

But, as a matter of fact, the proofs show that Redick did not claim a conveyance from Pundt and Koenig, under their contract with Hughes. This contract had been abandoned by Hughes (Briggs' testimony). Nobody claimed anything under it. Before the transfer from Hughes to Redick and Briggs, all Hughes' rights and interest in the store lot had been extinguished by the judicial proceedings. Redick's whole and only claim, or supposed claim, was that the reversal of the decree by the United States Supreme Court might give Jones and his assigns a title. The claim was bareless in law, but to avoid litigation Pundt and Koenig conveyed to him the premises in controversy. This cannot, by any possibility, be held to confer on McAusland any new rights and equities. Woolworth testifies, "that he claimed Pundt and Koenig had a good title under the execution sale."

VI. McAusland came too late to enjoin the agreement. For years he utterly refused to pay the notes (see Gautt's testimony), for years he refused to pay the taxes, and once or more the land was sold for non-payment. He filed his bill after the value of the lot had increased from $500 to $4,000 or $5,000. Meantime he has had possession for nearly ten years. The rental, at ten per cent on the average value, would be about $3,000, and he took the personal guaranty of Sahler & Co., that Hughes should convey, *and on failure to do so should pay $2,000 damages.*

He bought in view of the litigation knowing that the title was doubtful, and secured himself accordingly. The title was adjudged adversely to Hughes and his grantor, Jones. The property was sold at judicial sale, passed to

McAusland *v.* Pundt.

*bona fide* purchasers, and before and aftewards McAusland refused to perform his part of the agreement. He has no equities.—*Wil. Eq. Jur.* 291 ; 2 *Wheat.* 326 ; 6 *Wheat.* 518 ; 6 *Pet.* 389 ; 4 *Pet.* 311 ; 14 *Pet.* 173 ; 26 *Wend.* 247 ; 1 *John. Ch.* 375 ; 5 *McLean,* 253 ; 4 *John. Ch.* 559 ; 5 *Ib.* 193 ; 3 *Mason,* 244 ; 7 *Paige* 22 ; 11 *Ib.* 264 ; 2 *Story's Eq.* 759.

The contract between Hughes and McAusland provided, that if Hughes failed to convey, McAusland " shall collect \* \* the sum of $2,000 as damages." This remedy is thus made exclusive. A suit for specific performance cannot be sustained.

VII. As to the effect of not avering in an answer that Pundt and Koenig were purchasers for value, we say,

1. The complainant himself states a conveyance which, if valid, and for a valuable consideration, shows that he cannot maintain his action, he must, therefore, in order to avoid the effect of it, charge that it was not for value.

2. The fact of a valuable consideration not being denied, and the conveyance being alleged and admitted, if the proofs show *prima facie,* and by fair and reasonable presumption that it was for value, defendants are entitled to the benefit of it. The proofs do show conveyance and possession under it for several years, and that it is extremely improbable, if not almost impossible, that the conveyance was voluntary.

3. The fact of valuable consideration not being denied, it was not necessary to prove it.—*Story's Eq. Pl.* 677, *note.*

VIII. As to the effect of the mortgage provision in the Hughes and McAusland contract, we say :

1. Unless the court should first arrive at the conclusion that Pundt and Koenig could have been compelled to convey to Hughes, it is immaterial what McAusland's rights were as

McAUSLAND *v.* PUNDT.

between him and Hughes. He cannot compel them or their assigns to convey.

2. The most that McAusland can possibly claim in his own favor is that Hughes had an option to consider McAusland possessed of the equitable title, and to foreclose this by strict foreclosure, or by sale of the equity. This might be for Hughes' interest. But he is not precluded in a suit for specific performance, from objecting to McAusland's non-performance and laches. His remedy by foreclosure was merely cumulative.

3. If the parties did agree to establish the relation of mortgagor and mortgagee between themselves, in relation to the title, it is certain that McAusland cannot maintain a suit for specific performance, either as mortgagor or mortgagee.

CROUNSE, J.

This is an appeal from a decree rendered by myself, sitting in the District Court for Douglas county, dismissing complainant's bill. This court being unanimous in sustaining the decision there made, I will briefly state some of the reasons inducing it.

The suit was brought in the name of Alexander McAusland, and revived in the name of his children, the present complainants, to enforce the specific performance of a written contract entered into between one Hughes and himself, for the sale of a certain building lot in the city of Omaha.

The facts involved may be best understood when stated in the order of their occurrence chronologically.

February 14, 1859, William M. Jones held the legal title to a certain lot in Omaha, which may be designated as the Farnham street lot. On that day a suit was instituted in the District Court for Douglas county, by Charles W.

MCAUSLAND *v.* PUNDT.

Green, and others, creditors of one Franklin W. Brown, against said Brown and Jones, alleging that Brown was the real owner of said lot, and asking a decree declaring that Jones held the same in trust for the benefit of the creditors of Brown, and that it be sold to satisfy their judgments. May 28, 1859, Jones, in writing, agreed to sell to John Hughes, aforesaid, the Farnham street lot, Hughes to pay him $2,000 at any time Jones should execute and deliver to him a good and sufficient warranty deed of said premises, and until such time Hughes to pay Jones $300 annual rent for the use of the same. May, 30, 1859, Pundt and Koenig being seized in common of the lot in question, and which may be distinguished as the "Douglas street lot," entered into a written agreement with Hughes, by which the latter agreed to convey by warranty deed the Farnham street lot to them, when he should obtain title to the same, when Pundt and Koenig were, besides other considerations, to convey to Hughes the Douglas street lot.

July 9, 1859, Hughes and Alexander McAusland enter into the agreement in writing, the specific performance of which is sought in this suit, by which Hughes sells to McAusland the Douglas street lot, and is to execute a good and sufficient deed for the same when McAusland shall have paid three several promissory notes given to Hughes, each for $116.67, payable in one, two and three years, respectively, with ten per cent interest annually. McAusland is to pay all taxes assessed on the premises. Upon McAusland's failure to perform any of his agreements, Hughes may declare all the remaining payments due, and may foreclose the agreement as a mortgage. Hughes agrees that if he shall fail to make the deed as therein named, McAusland shall collect the sum of $1,000 damages. The agreements of Hughes are guaranteed by Sahler and Company. Under this agreement, McAusland

McAusland *v.* Pundt.

went into possession, put on the lot a building worth from $1,000 to $1,500 ; has occupied the premises ever since, paid the taxes thereon but rarely, and has paid nothing upon the notes. January 15th, 1861, the District Court, in the suit of Green and other creditors against Jones, decreed that Jones held the Farnham street lot in trust, and that it be sold to pay Brown's creditors. From this decree an appeal was taken to the Supreme Court of the Territory, but no bond was given to stay the execution of the decree. May 13, 1861, the Farnham street lot was sold by the sheriff under the decree last mentioned, Green, one of the plaintiffs, becoming the purchaser. The sale was confirmed, and Green received a deed for the premises. June 11, 1861, the Supreme Court of the Territory affirmed the decree of the District Court. From the judgment of that court an appeal was taken to the Supreme Court of the United States. March 11, 1861, Green sold and conveyed the Farnham street lot, so bought by him at sheriff's sale, to Pundt and Koenig aforesaid. July 10, 1862, Hughes, then residing in England, " sold and conveyed and quit-claimed to John I. Redick and Clinton Briggs, certain real and personal property in Nebraska, describing among others the Farnham street lot, but not the Douglas street lot, " and all other real or personal property which have any legal or equitable interest in ;" also " sold and assigned to them all the moneys, rights and credits of every description belonging to him from any one, &c." In December, 1865, the Supreme Court of the United States reversed the decree of the District and Supreme Courts of Nebraska, in the case of Green and others, against Jones and Brown. March 24, 1866, Jones conveyed to Redick and Briggs all of his interest in the Farnham street lot. Shortly thereafter, Redick and Briggs released to Pundt and Koenig their interest in the Farnham street lot, and received in return a deed for themselves of the Douglass street lot.

McAUSLAND *v.* PUNDT.

The complainant's claim to succeed, proceeds upon the assumption that Redick and Briggs, as the assignees, and under the conveyance from Hughes, first executed the contract between Jones and Hughes, thereby possessing themselves of the Farnham street lot, then exchanged that with Pundt and Koenig for the Douglas street lot, in pursuance of the contract between Hughes and Pundt and Koenig; and that now having the lot in question as the assignees of Hughes, and having notice of Hughes' contract with McAusland, they are as much bound as he would have been to convey to McAusland or his representatives. This theory gives no importance to the circumstance, that long prior to the conveyance from Jones to Redick and Briggs, of the Farnham street lot, the same had been sold to Green under judicial sale, who had sold to Pundt and Koenig. This, to my mind, is a very important circumstance; for, if Pundt and Koenig had already possessed themselves of a good title to the Farnham street lot, from another source than from Hughes, the consideration for which they were to give Hughes the Douglas street lot, was gone, and neither Hughes nor his assignees could claim the Douglas street lot because of the contract between Hughes and Pundt and Koenig. This circumstance appellant's counsel wipes out in a very summary manner with a syllogism: "No man can transfer a greater right or interest than he himself possesses." Green's title, Green being a party to the suit in which the decree was given, upon the reversal of the decree by the United States Supreme Court, must have reverted to Jones. Green conveyed to Pundt and Koenig; therefore Pundt and Koenig's title passed back to Jones. But the maxim here invoked, like many others, is subject to its qualifications and exceptions. The books are full of illustrations, showing that the rights which fall under the protection of commercial law, the respect paid to judicial proceedings, the regard given to claims of innocent

McAUSLAND *v.* PUNDT.

parties, and the like, are considerations before which the rule must give way. By sale in market overt, one wrongfully in possession of a chattel may convey a good title to a *bona fide* purchaser ; so, the holder of a negotiable note, who could not himself recover upon it as against the rightful owner, may frequently, by transferring it for value, vest a perfectly valid and unimpeachable title in the assignee. So, under the law of stoppage *in transitu*, the title of the consignee may be such that the consignor may revest himself of the goods; but possessed of a bill of lading, the consignee may transfer a title to an innocent third party, which is beyond the power of the consignor to disturb. "The law," says Chancellor KENT, in *Denniston* v. *Bacon*, 10 *Johns.* 197, "has always had a regard for derivative titles, when fairly procured; and though it may be true as an abstract principle that a derivative title cannot be better than that from which it is derived, yet there are many necessary exceptions to the operation of this principle." In that case, a sale under the power of attorney contained in a mortgage, being equivalent to a foreclosure under a decree of a court of equity, was held to give good title, notwithstanding the contract upon which the mortgage was given as security, was usurious, and the statute declared the contract and the security given under it, void.

Let it be conceded that, had Green retained the Farnham street property under the reversal by the United States Supreme Court of the decree of the courts of Nebraska, Jones would have been in as of his former estate, is it because Green was seized of what counsel chooses to term a "defeasible title," or because of considerations of convenience, the relation of particular persons to the property at the time, and like matters not growing out of the character or quantity of the estate held by Green? For it must be admitted, that if the owner of a determinable fee conveys in fee, the determinable quality of the estate

follows the transfer. 4 *Kent Com.* 10. The District Court of Nebraska, with authority unquestioned, had decreed that Brown was the owner of the lot, and ordered that it be sold. No supersedeas bond being filed to stay the execution of this decree, the sheriff was compelled to sell it. *Revised Statutes, Code, title* 24, *section* 775. The title he conveyed was the same quantity that Brown might have conveyed. That, by the District Court, was declared to be the fee simple in a decree which was in full force. It is not disputed but that had a third party purchased at the sheriff's sale, instead of a plaintiff in the suit, his title would have been absolute and unaffected by this reversal. *Wood* v. *Jackson,* 8 *Wend.* 9 ; *Woodcock* v. *Bennett,* 1 *Cow.* 711 ; *Taylor* v. *Boyd,* 3 *Ham.* 337. This is so by statute, which makes no distinction in favor of third parties. *Code,* 508. The deeds given to the party purchaser, and to third parties, are similar. No defeasance is expressed, and a deed cannot be defeated by one not in writing. Therefore, with the same grantor, a given estate, conveyances identical, and under a law discriminating in favor of neither, it necessarily follows, that the estate passed in either case must be the same. If there be any good reason why the property reverts from the hands of the purchaser plaintiff, it must be for some other than that he takes, what can legally be denominated, a defeasible title. Judge Lane, in *Hubbel* v. *Broadwell,* 8 *Ohio,* 120, (one of three cases cited in support of the position that had Green retained the property until the reversal of the decree, it must have reverted to Jones), says : "It is the settled policy of the court to protect judicial sales. Where lands have passed by sale under execution, to a stranger to a judgment, the statute compels the owner of the land, on reversal, to pursue the fruits of the sale in the hands of his antagonist. But when a party to a judgment purchases and continues to hold, this rule does not apply with the same force.

McAUSLAND *v.* PUNDT.

The purchaser is a party to the errors, and it seems most consonant with justice, to restore the land itself to its original owner, where it remains between the original parties, and within reach of the court, no new rights intervening." The statute here referred to, is that of which I believe ours is a transcript. What warrant there may be for a court to override the express language of it, when it declares that "such reversal shall not defeat or affect the title of the purchaser," to the prejudice of a party to a judgment, because in his opinion, "it seems most consonant with justice," I shall not here stop to inquire. But from the peculiarly guarded manner of expressing himself, it is very certain that the rule here announced was not designed to extend to a case like the present one, where the property has passed from the hands of the judgment creditor to those of third parties. The language used is "*where a party to a judgment purchases and continues to hold,*" and "where it *remains between the original parties and within reach of the court, no new rights intervening.*"

The next case, *McBlain* v. *McBlain*, 15 *Ohio St.* 337, is not one of reversal of a judgment, but of an order confirming a sale; a distinction to which some importance is given in the opinion. Even in this case, caution is shown not to extend the effect of a reversal to third parties. WELCH, J., who delivered the opinion, says, "It is enough here, however, to say that the purchaser was not only a party to the sale, but also a party to the suit, and that no legal rights had been acquired by third parties before the reversal." In the remaining case, *Wambaugh* v. *Gates*, 4 *Seld.* 138, the doctrine contended for, that title obtained at a sale under a decree authorizing it, which is subsequently reversed by an appellate court, is subverted by the reversal, is simply assumed, with no argument or authority to support it.

Whatever may be thought of the correctness of the

[S. C. N.] 16

main position asserted in these cases, it does not follow that grantees from purchasing parties stand in the same position, but the contrary is plainly inferable from them. And this is consonant with authority and good reason.

In *Lovett* v. *The Ger. Ref. Church*, 12 *Barb.* 67, the contest was as to who were the rightful officers of a certain church corporation. The first party having, by a decree of the Chancellor, been declared the rightful officers, under authority given them, executed a mortgage and confessed a judgment. After this, the second party appealed from the Chancellor's decree and it was reversed, and they were restored. In a suit brought to foreclose the mortgage given, while the first set of officers were acting, it was held that such mortgage was a valid lien. The court says : "Indeed, unless the decree of a court of competent jurisdiction protects third persons not parties to the suit, dealing with the successful party on the faith of the decree, no judgment can be of any avail until it shall have received the sanction of the highest tribunal of the land, or until the time for appealing shall have expired."

The rights of third parties are well expressed by BRON-SON, Ch. J. in *Langley* v. *Warner*, 3 *Com.* 327. In that case Walsh recovered a judgment against Langley, upon which execution issued and money collected. By agreement between Walsh and his attorney, Warner, the money was paid by the officer to the latter to apply on account for services. On review by the Appellate Court, the judgment was reversed and restitution ordered. Langley being unable to collect the money from Walsh, on the order of restitution, brings an action against Warner. Having succeeded in the court below, the case was reversed in the Court of Appeals. The learned judge, in delivering the opinion of the court, among other things, remarks : "I see no principle on which the action can be maintained. The defendant has got none of the plaintiff's money ; he has

got nothing but his own. Walsh had a perfect title to the money when it was collected; just as perfect as it would have been if no *certiorari* had been issued. He had a right to do what he pleased with the money, and he made a very proper use of it by paying his debts. The plaintiff has taken up the strange notion that because he was trying to get the judgment reversed, Walsh could not give a good title to the money, especially if he paid it to one who knew what he was trying to do. I am not aware of any foundation for such a doctrine. As Walsh had a good title to the money he could, of course, give a good title to the defendant, or any one else. No one was bound to presume that the judgment of a court of competent jurisdiction was erroneous, and would be reversed. The legal presumption was the other way, that the judgment was right and would be affirmed. But if the judgment had been known to be erroneous, the pendency of the proceedings in error could not affect, in the least degree, the title of Walsh to the money. Nothing short of a reversal of the judgment could destroy or impair his right."

In *Gray* v. *Brignardello*, in the Supreme Court of the United States, 1 *Wallace*, 627, it is laid down: "It is a well settled principle of law that the decree of a court which has jurisdiction of the person and the subject matter is binding until reversed, and cannot be collaterally attacked. The court may have mistaken the law or misjudged the facts, but its adjudication, when made, concludes all the world until set aside by the proper appellate tribunal; and, although the judgment or decree may be reversed, yet all right acquired at a judicial sale, while the decree or judgment was in full force, and which it authorized, will be protected. It is sufficient for the buyer to know that the court had jurisdiction and exercised it, and that the order, on the faith of which he purchased, was made and author-

McAUSLAND *v.* PUNDT.

ized the sale. With the errors of the court he has no concern."

Numerous other cases might be added, some declaring the doctrine generally and without exception; while all agree that as to third parties, rights acquired under a judgment of a court of competent jurisdiction, are not affected by the reversal of such judgment. Third parties include as well those who may acquire their rights through a party to the suit, while the judgment is in force, as those who purchase immediately at the sale. The grantee of such party to the suit buys from one who obtained title through one of the best known sources. At the time of his purchase no appeal may have been taken, and he has no right to expect there will be. If an appeal has been taken, he is not to suppose that the judgment will be reversed, but the contrary rather. Notwithstanding, as in the case of *Hubbel* v. *Broadwell*, referred to by counsel, courts may, on reversal of a judgment or decree, regard it as most consonant with justice to hand back the identical land, if yet in possession of a party; still, until reversal, it cannot be denied that the party purchasing under the decree or judgment has as good a title as a third person, and, if he conveys, transfers as complete a title as would be taken by a third party directly at the sale. Both parties take under the same judgment or decree, and while it is in full force, the law protects both equally.

In this view of the point raised, Pundt and Koenig took from Green a title to the Farnham street lot, unaffected by the reversal of the decree in the case against Brown and Jones.

The discussion under this head, has thus far proceeded upon the assumption, that had Green retained the title to the Farnham street lot until the reversal of the decree under which he bought, Jones would have been in as of his former estate. This was conceded by counsel for appellee,

McAusland *v.* Pundt.

and, as I understand, agreed to by a majority of the court.' As for myself, I prefer to go one step further, and hold that Green, as plaintiff in the suit, under the decree on which he purchased, took a title no more affected by a reversal of the decree than though he had been a stranger. This I regard the better ground, and in harmony with well established principles of law. With the concession, that a stranger to the suit would take a title unaffected by the reversal of the decree, as a legal conclusion, it follows with mathematical certainty, that the party to the suit who might buy at the same time, taking under the same decree and same proceedings and instrument, must take a like title, unless there be some controlling consideration opposed. After some examination, I have been unable to find any such reasons or considerations. Those assigned in the opinion in the case of *Hubbel* v. *Broadwell, supra,* seem unwarranted and are far from being satisfactory. There, it is seen, the positive terms of a statute which declares that "such reversal shall. not defeat the title of the purchaser," are disregarded, and a party to the suit is excepted from its protection because he is "a party to the errors, and it seems most consonant with justice to restore the land to its owner." To say nothing of a want of authority to summarily override a plain statute, is the reason well founded in fact? Is the rule following it a safe one to adopt and apply with the uniformity which should characterize all legal rules? There is no law prohibiting the party to a decree to bid at a sale under it. He becomes a purchaser, when he bids more than a stranger. If he is not to have the same protection for his title, his bidding is discouraged, and to this extent the defendant, in a decree or judgment, is liable to have his property sold at a diminished price. If the property, as in the case before us, is a building lot, the value of which consists in affording a place to erect a building, should the party purchaser be required to hold the property at great expense

for years perhaps, to await the final result of an appeal before he can make any use of it? If he is to build, is he to receive any consideration for his improvements? On the other hand, and it is said to be a poor rule that does not "work both ways," suppose the property purchased by him to consist of valuable buildings, which, by accident, have been distroyed, is justice satisfied by returning to the original owner the lots and ashes? Or should the property be timbered or mining lands, will it do for the party purchaser to strip them of the timber or minerals, and return the worthless soil? I know of no power in a court of equity to stop him who is possessed of a sheriff's title, under a judgment in full force, from cutting timber or extracting minerals from lands purchased, even though he be a party to a judgment or decree. This must be because in law, he has the valid title. The law has provided against all this by allowing execution to be stayed by a proper bond.

Those are but few of many queries which naturally suggest themselves, and which must show the working of such a rule very complicated, and anything but in consonance with justice. No force is given to the rule to say that he is a "party to the errors." If it be the errors which invalidate, they must operate against strangers as well.

The real ground assumed is, that as a party in possession it is the easier and simpler way to "square up," by handing back the identical land. This we have seen is a very uncertain and inequitable rule. To pursue the fruits of the sale, to have a return of the money for which the property sold, affords at once a fixed and invariable rule, and against which I can perceive no good objection. In presumption of law, the property being sold at public sale, brought its value. The sale was permitted by the defendant by not filing his *super sedeas* bond. The plaintiff, under the law, is at liberty alike with strangers, to bid and pur-

chase under the authority of the decree, and should have equal protection. Any errors which may have intervened, are the errors of the court with which he has no concern. In case of no reversal, the defendant is benefited by the plaintiff being a purchaser to the extent that he may have raised the price of the property sold. The only other objection I have heard or have been able to discover, is the loose expression thrown out in some cases where the right of third parties or strangers to the suit are referred to, that such rights are upheld: because such rule is calculated to encourage bidding, from which the inference is drawn, that parties to the judgment are not within the policy. This is fallacious. We acknowledge a sad weakness in solemn decrees and judgments of courts of unlimited jurisdiction, standing in full force, if they are subject to considerations of policy and convenience. No encouragement to bidding is an incident or result following the reliance or confidence which is always given to the face of judgments and decrees pronounced by courts of competent jurisdiction, while such judgments and decrees stand in force and are unreversed. Such expressions, no doubt, take their origin from *Manning's case*, 8 *Coke*, where it is said: "If upon his judgment the plaintiff takes out a *fieri facias*, and thereupon the sheriff sells a term for years to a stranger, and the judgment is afterwards reversed, the defendant shall only be restored to the money for which the term was sold, and not the term itself; for by the writ the sheriff had authority to sell, and if the sale might be avoided afterwards, few would be willing to purchase under execution, which would render writs of execution of no effect."—*Bac. Abr. Tit. Ex.* 2, *Ro.* 778; *Cro. Eliz.* 278; *Moore* 573; *Leon* 89; 1 *Mand S.* 425. It will be remarked that the principal asserted here is, that the stranger's title to the term for years, rests upon the fact that "by the writ the sheriff had authority to sell," and what is said about purchasers being unwil-

McAUSLAND v. PUNDT.

ling to buy if the rule were otherwise, is simply in commendation of the rule, and not the rule itself or the ground on which the rule rests.

This case, it will also be remarked, speaks of the sheriff "selling to a stranger" and seemingly makes a distinction in his favor. This is cited in many of the cases which maintain the rights of third parties, or strangers purchasing at judicial sales, and the inference has been drawn from the language used, that parties to the suit fall without the protection given by the law to strangers. Such use has been unwarranted and indulged in without examination. The sale of lands under execution, was unknown to the common law. Such sale would have been an invasion of the foedal principle then existing, which prohibited the sale or alienation of lands. Under the statute of *Westm.* 2, 13, *Edwd. I. C.* 18, the writ of *elegit* was given by which the defendant's goods were appraised and delivered to the plaintiff. If this were not sufficient to satisfy the judgment then a moiety of his lands were passed to the plaintiff, to hold until out of rents and profits thereof the debt was levied.—3 *Blackstone's Com.* 418. We can readily see that where no title passes but the lands are held to satisfy a judgment given, upon a reversal of such judgment, the lands should be returned to the defendant. This is illustrated in *Tidd's Practice, vol.* 2, *page* 1138. "But if a man recovers damages in a writ against B. and have an *elegit* of his chattels and a moiety of his lands, and the sheriff upon this writ deliver a lease for years, of the value of £50 to him, that recovered *per rationable pretium et extentum, habendum* as his own term, in full satisfaction of £50, part of the sum recovered; and after B. reverse the judgment, he shall be restored to the same term, and not to the value; for though the sheriff might have sold the term upon this writ, yet here it is no sale to a stranger, but a delivery of the term to the party that recovered, by way of extent, without any sale, and therefore the owner

McAUSLAND .v. PUNDT.

shall be restored.—*Bac. Abr. Lit. Ex.* 2 *Cro. Jac.* 246. That it would be otherwise if sold to a stranger who, of course, parts with his money, is true.—*Selw.* 108 ; *Bac. supra.*

Without pursuing this discussion further, to me, the rule contended for by counsel, seems without reason to sustain it, and no doubt, to a great extent, was induced by a misapprehension of the authority cited in its support. The true rule, and the one I believe will be established generally, is that the title acquired under judicial sale is equally good, whether taken by a party to the suit or a stranger, and not affected by a reversal of the decree or judgment in the hands of one any more than in those of the other.

Counsel makes the further objection, that as vendees in possession under contract with Hughes, and through him under Jones, Pundt and Koenig could not allege their purchase of the outstanding title against him or his grantors. For the purpose of answering this objection, we may regard the duties and obligations of a tenant paying rent, and a vendee in possession under a contract for the purchase of the premises the same, resting upon that principle of equitable estoppel which forbids a person denying a title, by recognizing which he was permitted to take possession.— *Mattis* v. *Robinson, ante.*

This rule, however, must be confined to the title of the landlord' or person contracting to sell, had at the time such possession is given. Subsequently to making the lease or contract of sale, the lessor or vendor might sell the premises. In that case I see nothing to forbid the tenant or vendee in possession from recognizing or treating with him, to whom the vendor or landlord had sold. What the vendor could himself voluntarily do, the law can as effectually accomplish in cases falling within its authority. In this case Pundt and Koenig did not question the title of Jones. Other parties did and the court adjudged that he

had no title, and ordered the premises sold as being, in fact, those of Brown. After Green had obtained the complete legal title, there was nothing in the way of Pundt and Koenig bargaining with him. It is well settled, that a tenant is not estopped from showing that the interest of the lessor has passed from him by his own conveyance, or by sale under judgment against him.—*Bingham on Real Estate.* 210. The tenant himself may become purchaser at such judicial sale.—*Idem.* 15 *N. Y.* 377. It follows, then, that Pundt and Koenig, after the reversal of the decree made in the case of Green and others against Jones and Brown, were possessed of a good title to the Farnham street lot from a source other than from or through Hughes, and that the consideration for which they were to convey to him the Douglas street lot was gone, and they accordingly relieved from their obligation to convey. It was then that Redick and Briggs obtained a release from Jones of his interest in the Farnham street lot. It has been shown that Jones, in fact, had no remaining interest in it. Whether Redick and Briggs knew this, or whether they supposed that by the reversal by the United States Supreme Court of the decree, Jones was invested with his original title, it matters not. They bought evidently on their own behalf, and not as the representatives or assignees of Hughes. Hughes had years before abandoned his contract. With this pretence of title from Jones, Redick and Briggs approach Pundt and Koenig and obtain the Douglas street lot in consideration of their release to them of this assumed interest in the Farnham street lot. Whether Redick and Briggs believed that, through the reversal aforesaid, they were seized of a good title to the Farnham street lot, or whether, thinking it a question of some doubt, the parties compromised upon an arrangement which gave Redick and Briggs the Douglas street lot, or whether knowing they took nothing under the Jones release, but,

McAusland *v.* Pundt.

using the release as a pretext, exercised sharp practice upon Pundt and Koenig, I deem it unnecessary to inquire ; and, although in getting this property in question they followed in the order of the several contracts enumerated, it is clear Redick and Briggs did not, in fact, act as the assignees of Hughes, following those contracts. They acted independently of them, and while they undoubtedly used a knowledge of them to their own advantage, it is their own good fortune, and cannot avail the appellants.

I have thus briefly reviewed the more important points, presented and very ably argued by counsel. There are other grounds still upon which the dismissal of the bill might properly have rested. At the very threshold of his application to a Court of Chancery, the complainant stood confronted by several rules which have controlled Courts of Equity in denying relief of the kind sought here. Beyond what would have seemed profitable to him, McAusland performed none of the obligations of his contract with Hughes. The notes expressing the price to be paid for the Douglas street lot, were never paid, not a cent of principal or interest. The taxes which he undertook to keep down were left unpaid, and the place was allowed to be sold and had to be redeemed by Pundt and Koenig. More than this, McAusland is shown to have been insolvent, and had Hughes sought to collect the notes he would have been unsucessful. Again, the property which at the time of making the contract was worth but $500, and which remained so, or of even less value for several years, afterwards grew rapidly in value till worth several thousand dollars. A Court of Equity will not lend its aid in case of gross negligence.—*Dyce* v. *Ford,* 4 *Bro. C. C.* 497. Nor will it allow parties to lie by, with a view to see whether a contract will prove a gaining or losing bargain, and, according to the event, either abandon it, or considering the lapse of time as nothing, claim a specific performance, *Alley* v. *Deschamps,* 13 *Vesey* 228, unless the

complainant has taken all the pains he could to be ready to carry into execution the agreement, *Guest* v. *Hornfray*, 5 *Vesey*, 822, nor, unless he has shown himself ready, prompt and eager, *Note* 2, 5 *Vesey* 720, *Sum. Ed.*, nor, must there have been a change in circumstances affecting the character and justice of the contract.—*Pratt* v. *Law*, 9 *Cranch* 456 493. The rules as announced in these cases, the record shows the complainant to have violated, unless he stands relieved by the excuse offered by his counsel. That is, because Hughes did not hold the title to the lot which he agreed to convey with warranty, and whether he ever could get it, being contingent upon the suit between Green and Jones, McAusland was excused from paying his notes at their maturity. This hardly satisfies. The suit involving Jones' title was pending when the several contracts were made. McAusland was constructively advised of it, as there is no doubt he was in fact. He seems to have provided against an adverse determination of that suit by taking the guaranty of Sahler & Co., for some $2,000. The notes were negotiable, which were given on the making of the contract, and had McAusland been of sufficient responsibility they could have been transferred and collected. The prospect of a good title or the guaranty of Sahler & Co., seems to have been a sufficient warrant for him to erect a cheap building on the premises. To my mind all these circumstances are evidence that McAusland well knew the fact that Jones' title was in litigation, and that he bargained and acted with reference to it. But after putting on a cheap building, and the property not appreciating for a time in value, he no doubt found it profitable and convenient to pay nothing on the purchase price, and to occupy the place for a term of years without the payment of rent and taxes. At last he asks that he be allowed to pay the five hundred dollars, which should have been paid years ago, and take a place worth as many thousand. This

McAusland *v.* Pundt.

would be a good enterprise, and if it could have the favor of this tribunal, the courts would swarm with applicants eager to engage in like speculations. The decree rendered in the court below must be affirmed.

Judgment affirmed.