DAVID BRADLEY & COMPANY, APPELLEE, v. UNION PACIFIC RAILROAD COMPANY, APPELLANT.

FILED MARCH 22, 1906.   No. 14,080.

Specific performance of a contract for the sale of real estate will not be awarded at the suit of the vendee or his assignee, where the evidence discloses gross laches in making the payments stipulated for in the contract, where time is made of the essence of the contract by the agreement of the parties.

APPEAL from the district court for Douglas county: WILLIS G. SEARS, JUDGE. Reversed and dismissed.

John N. Baldwin and Edson Rich, for appellant.

Flickinger Bros. and Baldrige & De Bord, contra.

OLDHAM, C.

This was an action for specific performance of certain land contracts entered into by the Union Pacific Railway Company with one Michael O'Neill, and assigned by him to plaintiff, David Bradley & Company, to secure an indebtedness from O'Neill to the plaintiff. There was a trial of the issues to the court, and a judgment for the

plaintiff, and a finding that plaintiff was entitled to a specific performance of the contracts sued upon; that the value of plaintiff's interest in the contracts was equal to the amount of the indebtedness which the contracts were given to secure, and a decree that, if the defendant should pay the amount of plaintiff's debt and interest within 20 days of the judgment, the lien should be canceled and satisfied, and that, if defendant should fail to pay the indebtedness for more than 20 days from the date of the judgment, plaintiff should be decreed a specific performance of the contracts on payment of the amounts found due thereon from plaintiff. To reverse this judgment defendant has appealed to this court.

The facts underlying the controversy are that on the 31st day of May, 1884, the Union Pacific Railway Company sold to Michael O'Neill two sections of railroad land in Deuel county, Nebraska, the sale being evidenced by eight separate contracts, each for a particular quarter section of the land. These contracts provided for the payment of the purchase price in ten equal annual payments, with interest on the deferred payments. The contracts contained, among others, the following condition: "And it is hereby agreed and covenanted by the parties hereto that time and punctuality are material and essential ingredients of this contract, and in case the second party shall fail to make the payments aforesaid, and each of them, punctually, and on the strict terms and times above limited, and likewise to perform and complete all and each of his agreements and stipulations aforesaid strictly and literally, without any failure or default, then this contract, so far as it shall bind said first party, shall become utterly null and void, and all rights and interests hereby created or then existing in favor of or derived from the second party, shall utterly cease and determine." O'Neill made the first payment on these contracts in cash and three subsequent payments for the years 1886, 1887, and 1888 and no other payments have ever been made on the contracts. On the 25th of February, 1886, O'Neill,

with the consent of the railway company, assigned the contracts in dispute to Charles A. Wilson, of Chicago, Illinois, as collateral security for the sum of $2,900 owed him by O'Neill, and on the 14th day of October, 1892, O'Neill made a conveyance of his interest in the contracts in dispute to plaintiff David Bradley & Company, to secure an indebtedness of $957.75 owed to said company. This instrument was made subject by its terms to the prior assignment of the contracts to Charles A. Wilson, and was duly recorded in Deuel county. After O'Neill ceased making payments on the contracts in issue, the railway company corresponded with Charles A. Wilson and urged him to make the deferred payments on the land. After considerable correspondence with Wilson and after one of the employees of the railway company had called personally upon him, Wilson, not caring to make any further payments to protect his security, returned the contracts to the company, with a letter urging it to give O'Neill until the 15th of August, 1893, either to pay up all the contracts or to make payments as he was able on a portion of them. In response to this request, the company refrained from canceling any of the contracts when received. O'Neill, however, never made, nor attempted to make, any further payments on any of the contracts. The company then made an effort to get the plaintiff, David Bradley & Company, to pay the balance due on the contracts. In 1896 the plaintiff wrote to the land department of the Union Pacific Railway Company to get the amount of the indebtedness on the contracts. The railway company informed plaintiff of the amount due, in a letter stating that on the receipt of the amount a deed to the land would be issued to the plaintiff. It appears that on the receipt of this information plaintiff sent one of its traveling agents to examine the land and report its probable value; but, when the report was received, the plaintiff, as it claims, declined to pay on the contracts and take a deed, because it feared that the receivers of the Union Pacific Railway Company had not sufficient au-

thority to execute a valid conveyance. After this the employees of the railway company's land department made several requests to plaintiff to complete the contracts and notified plaintiff that the contracts would be canceled if they were not paid.

In 1899 the Union Pacific Railway Company was succeeded in the ownership and control of the railway system and the lands in dispute by the Union Pacific Railroad Company, which company canceled the contracts, and sold the land to William Law on the 18th day of October, 1899. Later William Law assigned his contracts of purchase to James G. Piercey, the present owner, whom plaintiff attempted to make a party defendant in the present suit. On February 23, 1901, plaintiff by its attorneys, sent the following communication to the railroad company: "Feb. 23, 1901. B. McAllister, Esq., Land Commissioner, U. P. Ry., Omaha, Neb. Dear Sir: Our clients, David Bradley & Co., in 1892, procured an assignment of the contracts of one M. O'Neill to sections one and thirteen in Twp. 12, R. 44, Deuel county, Nebraska, which assignment was placed of record in Deuel county and recorded in book 1, page 211. The contracts number from 78,703 to 78,776, and from 75,307 to 75,310, inclusive, and were made to secure to David Bradley & Co. the sum of $957.75, due on said date. They wish to redeem and pay the balance due on the O'Neill contracts to your company and receive from it a deed for the property. Please advise us as to what amount will be necssary to redeem one or both of said sections under the O'Neill contracts, and oblige, yours very truly, Flickinger Bros." The railroad company replied to this letter, as follows: "Omaha, Neb., Feb. 25, 1901. Messrs. Flickinger Bros., Council Bluffs, Iowa. Gentlemen: In reply to your favor of the 23d inst., would say, that Sec. 13-12-44 has been sold and contract is in good standing, and Sec. 1 is for sale at $1.75 per acre, as per terms on inclosed slip. Yours truly, B. A. McAllister, Land Com'r." After this correspondence the present suit was instituted.

There are many reasons, in our view, why the judgment of the district court in this cause should not stand, one of which, however, will suffice for the conclusion reached. By the terms of the contracts of purchase of the lands in controversy, time and punctuality of payment are made of the essence of the agreement. While it is true, as contended by counsel for appellee, that forfeitures are never favored, either in equity or at law, and while it is also true that very slight proof will be held sufficient to show a waiver as to the date of payment on a contract of purchase of real estate, because of the disfavor in which forfeitures are regarded in courts of equity, yet this rule is always made to depend on a showing of diligence in fact by the vendee in making the payments and the further showing of a reasonable excuse for the failure of a strict compliance with the letter of the contract. This principle is clearly set forth in 1 Story, Equity Jurisprudence (12th ed.), sec. 776, as follows: "It is true that courts of equity have regard to time, so far as it respects the good faith and diligence of the parties. But if circumstances of a reasonable nature have disabled the party from a strict compliance, or if he comes, *recenti facto,* to ask for a specific performance, the suit is treated with indulgence, and generally with favor by the court. But then, in such cases, it should be clear that the remedies are mutual; that there has been no change of circumstances affecting the character or justice of the contract; that compensation for the delay can be fully and beneficially given; that he who asks a specific performance is in a condition to perform his own part of the contract; and that he has shown himself ready, desirous, prompt, and eager to perform the contract. Even where time is of the essence of the contract, it may be waived by proceeding in the purchase after the time has elapsed; and if time was not originally made by the parties of the essence of the contract, yet it may become so by notice, if the other party is afterwards guilty of improper delays in completing the purchase." This doctrine has been recognized and approved by this court in our

holdings in *McAusland v. Pundt,* 1 Neb. 211; *Morgan v. Bergen,* 3 Neb. 209; *Canfield v. Tillotson,* 25 Neb. 857; *Brown v. Ulrich,* 48 Neb. 409; *Whiteman v. Perkins,* 56 Neb. 181, and *Jewett v. Black,* 60 Neb. 173.

Now, under the undisputed facts in the case at bar, plaintiff took an assignment of O'Neill's interest in the contracts in issue, subject to Wilson's lien of $2,900 in 1892, for collateral security of a *bona fide* indebtedness existing between O'Neill and plaintiff. Under this assignment plaintiff had a right to discharge the Wilson lien and to protect its security by making the deferred payments on the contracts. Diligence in business would have suggested that, when the assignment was taken by the plaintiff, it should have inquired as to the condition of the payments, for a default of which a forfeiture was provided by the plain terms of the contracts; but it apparently made no such inquiry at the time it received the assignment. This tardiness of inquiry is sought to be explained by saying that the plaintiff naturally thought that O'Neill or Wilson would make the payments as they came due. If we should accept this wholly unsatisfactory excuse for the want of any inquiry at that time, we are next confronted with the fact that in 1896, eight years after the contracts were subject to forfeiture for nonpayment of six out of ten instalments due thereon, plaintiff did make inquiry as to the exact status of the contracts, and received the information asked for from the land department of the railroad company, with an offer, even at that late date, to make plaintiff a deed to the land if it would pay the amount then due. And, again, for two years after this communication the agents of the company frequently requested plaintiff to comply with the belated terms of payment, and plaintiff continued to neglect the offer, claiming as an excuse for its gross laches that it doubted the authority of the receivers in charge of the property to make a valid conveyance of the lands. Now, if we were content to treat this latter excuse as a reasonable and conscientious explanation of plaintiff's delay, we are still con-

fronted with the further fact that from 1899 down to the date of the letter set forth in the opinion plaintiff still continued to sleep on its rights, even after the lands had passed to the defendant, whose authority to make a conveyance thereof is not and cannot be questioned.

From all these facts we are compelled to find that plaintiff has been guilty of gross laches in protecting its security against the overdue payments on the contracts, during a period of nine years, and we are unable to resist the suggestion that, but for the recent rise in value of lands in western Nebraska, this suit would never have been instituted. Here is a fair portrayal of plaintiff's diligence, as reflected from the record. While the gates of opportunity stood long ajar for the full protection of its security, it doubted the quality of mercy offered, and slumbered and slept. When all reasonable doubt as to the authority to make the conveyance was removed by the purchase of the property by the defendant, it turned over, and continued to snore, and nothing but the powerful restorative of a sudden rise in the price of western lands sufficed to arouse it from its Rip Van Winkle sleep.

Finding no equity or conscience in the bill, we recommend that the judgment of the district court be reversed and the plaintiff's petition dismissed.

AMES and EPPERSON, CC., concur.

By the Court: For the reasons given in the foregoing opinion, it is ordered that the judgment of the district court be reversed and the plaintiff's petition be dismissed.

REVERSED.