JOHN O'HARA, APPELLANT, v. WALKER D. HINES, DIRECTOR GENERAL OF RAILROADS, APPELLEE.

FILED MARCH 28, 1922. No. 21656.

1. **Appeal: DIRECTED VERDICT.** "In determining whether a peremptory instruction was justified, the party against whom the verdict is directed is entitled to have every controverted question of fact resolved in his favor, and to have the benefit of every inference that reasonably can be deduced from the facts in evidence." *Schmelzel v. Leecy,* 104 Neb. 672.

2. **Master and Servant: NEGLIGENCE OF FELLOW SERVANT.** The provisions of the federal employers' liability act create a liability against the employer for the negligence of a fellow employee of an injured workman.

3. ———: **NEGLIGENCE: QUESTION FOR JURY.** Evidence reviewed in the opinion, and *held* that it was error for the trial court to instruct the jury to return a verdict in favor of the defendant.

APPEAL from the district court for Douglas county: CHARLES A. GOSS, JUDGE. *Reversed.*

*John O. Yeiser* and *John C. Travis,* for appellant.

*C. A. Magaw, T. W. Bockes* and *D. F. Smith, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, DEAN, ALDRICH, DAY and FLANSBURG, JJ.

MORRISSEY, C. J.

Plaintiff brought this suit against defendant under the federal employers' liability act. At the conclusion of the testimony, on motion of defendant, the court instructed the jury to return a verdict in favor of defendant. From the judgment entered on the verdict, plaintiff appeals.

The facts alleged in the petition and supported by plain-

tiff's evidence are as follows: September 13, 1919, plaintiff, a boy 18 years of age, was in the employ of defendant as an unskilled laborer in the operation of a crane, or gantry, in the Union Pacific Railroad yards, in Council Bluffs, Iowa. The Union Pacific Railroad Company owned a line of railroad crossing several states and was operated by defendant, the director general of railroads, in both interstate and intrastate commerce. The gantry on which plaintiff was employed was a big type of crane used in the transfer of heavy articles of freight from "bad order cars" to "good order cars" and also for the rearrangement, or reloading, of heavy pieces of freight.

On the day of the injury, plaintiff, his fellow workmen, and foreman had transferred an interstate shipment of steel from a "bad order car" to a "good order car." When this job was completed there was then no other car of material at the gantry ready for immediate transfer, but there was in the yards awaiting such transfer a carload of poles. This was likewise an interstate shipment. In making the transfer of freight by means of the appliance known as a gantry the men sometimes made use of ropes, chains or cables. For some time prior to plaintiff's injury there had been no cable in use, but there was in the tool house, situated where the men were employed, part of a wire cable that had formerly been used on the machine itself. The foreman gave directions to his crew of workmen, which consisted of plaintiff and three fellow workmen, to prepare this old cable for use in the transfer of the car-load of poles. In obedience to this order the men took the cable from the tool house and cut therefrom a section of the required length, 20 or 30 feet; clamps, or U bolts, were procured and a loop was made at each end of the cable sling. As thus made up, at each end of this cable there was left a rough end, each separate strand of the cable being exposed. This condition endangered the hands of any workman who might handle the cable. In order to obviate this danger, cloth was procured with

which to wrap the exposed wires, and it became necessary to procure a cord or wire to tie the cloth. No suitable wire or cord had been furnished by defendant, but one of the workmen, having seen some fine flexible wire in the coal car from which these men had unloaded steel during the forenoon, went to this car and procured wire, which is described as two strands, each about four feet in length, held together at one end by a copper cylinder, or it might have been one strand of wire eight feet in length doubled and fastened in the middle by this copper cylinder. This workman testified that after procuring the wire he held it up for the foreman's inspection; that the foreman expressed the opinion that it might be suitable, but gave expression to a doubt of the quantity being sufficient, because each end of the cable would have to be wrapped. The workman testified, further, that he attempted to twist the wire loose from the cylinder, but did not succeed; that he thereupon laid the wire across a steel rail and cut off one strand with a hammer. The strand thus cut off was then used in wrapping the cloth on one end of the cable. He later cut the remaining strand from the copper cylinder. He testified that he was about to throw the cylinder, with so much of the wire as was then attached thereto, into the car where he had found it, when plaintiff either asked for it, or reached for it, or both, and the witness thereupon handed the cylinder with the short pieces of wire projecting therefrom to plaintiff. The evidence is not clear as to the length of the wires still attached to the cylinder. It is said that they were "crumpled up," but according to plaintiff and his witness they were a few inches in length. Plaintiff testified that he did not know where the wire had been procured, and had not before seen the copper cylinder and did not know what it was; he says that he took it from his fellow workman for the purpose of straightening the wire in order that it might be used in tying the wrapping upon one end of the cable. Within a very short time after plaintiff was handed this wire and

cylinder by his fellow workman the cylinder exploded.

According to plaintiff's testimony he was in total ignorance of the dangerous character of the article he had been handed by his fellow workman. The copper cylinder is described as about one and one-half inches in length and one-fourth of an inch in diameter. Plaintiff testified that he held the cylinder in his left hand while with his right hand he pulled upon the crumpled, twisted pieces of wire for the purpose of straightening them. The cylinder slipped from his left hand and with the swing of his right arm it struck the steel rail on which he sat and the impact caused it to explode. The explosion was of such force that it indented the surface of the steel rail, and destroyed the sight of plaintiff's eyes. It may be taken as established, or conceded, that this cylinder with its attachments was an electric detonator generally used in exploding dynamite. The evidence shows that the explosive matter in detonators of this character consists of mercury fulminate; that this is pressed into the lower end of the cylinder, then a similar amount of powdered fulminate is put in. The ignition apparatus is then inserted and the ends of the wires imbedded in the last fulminate; and the cylinder is then filled with melted sulphur. Although these detonators are designed to be exploded electrically, they may be exploded by heat, by a blow or shock of sufficient intensity, or by friction. There is evidence offered by defendant calculated to dispute the testimony of plaintiff as to the cause of the explosion, but the explosion itself is not denied.

Plaintiff contends that defendant was negligent in failing to provide the necessary wires, repairs, tools and machinery for the proper equipment and operation of the machine with which plaintiff worked; that the foreman was negligent in failing to inspect properly the wire picked up in the coal car by plaintiff's fellow workman, and that this wire and its explosive attachment was negligently given to plaintiff by his foreman and fellow workman as a part of the tools and materials with which he was to work.

Defendant expressly alleges that plaintiff's fellow work-man was not acting within the scope and course of his employment when he handed the explosive cylinder to plaintiff; that it was not given in connection with the prosecution of defendant's business, but at the request of plaintiff to satisfy the curiosity and personal ends of plaintiff, and denies that plaintiff's injuries arose out of or in the course of his employment, or that plaintiff was acting within the scope of his employment at the time he received from his fellow workman the explosive substance, or when it was exploded. Defendant also alleges that neither he nor his agents, or employees, had any knowledge of the presence of the explosive until its discovery in the empty coal car by plaintiff's fellow workman; that neither defendant nor any of his agents, or employees, had any knowledge as to the place from whence the explosive came. It is further alleged that whatever injuries plaintiff received were due solely to his own negligence, and that when he received from his fellow workman the explosive he assumed the risk of exploding it. It is further alleged that plaintiff has no cause of action against defendant unless it is based upon the Iowa compensation law.

In the present state of the record it does not appear necessary to determine whether defendant was guilty of actionable negligence in failing to provide suitable wires, repairs, tools and machinery for the proper operation of the gantry. Passing over these allegations of negligence for the present, let us mention what appears to have been palpable negligence on the part of the fellow workman (and his negligence was the negligence of defendant) in handing this explosive to plaintiff. The fellow workman was older in years, and more experienced in service, than plaintiff; he knew that the wire was not originally designed for the work to which it was being put; that it had not been regularly furnished from the tool house or supply store. He saw it in the empty coal car, took it therefrom, discovered the copper cylinder, and testified that in his

attempts to twist the wire and break it off from the cylinder he saw a powdered substance spilling out of the cylinder. He said that it looked to him like a firecracker. Assuming that he was a man of ordinary intelligence and experience, it is strange, indeed, that these things did not suggest to his mind the likelihood of danger. That high explosives are used in the mining of coal and that detonators such as this are employed in discharging dynamite and other high explosives is a matter of common knowledge.

Plaintiff did not know at the time he was given this dangerous instrumentality that it had been picked up in an empty coal car; he did not know that his fellow workman had seen the powdered substance with which the cylinder was filled spilling therefrom as a result of the twisting and pulling of the wires. He received no warning of any kind. Indeed, his fellow workman testified that when he passed the cylinder to plaintiff he did so with the statement that it looked like a firecracker, a remark well calculated to put plaintiff off his guard. However, plaintiff does not appear to have heard the remark, and the most that can be said definitely is that it was placed in plaintiff's hands without warning. The foreman expressly denied that the wire was called to his attention, or that he had been asked to inspect it, or that he gave any general order to procure it. Defendant offered the testimony of experts, and each testified that in his opinion the detonator could not be exploded in the manner described by the plaintiff. But it may be noted that each of these witnesses gave his testimony on a question presupposing the detonator to be in the same condition as when it left the factory. The changes, if any, that may have taken place by reason of the treatment given the detonator in question do not appear to have been taken into account. From the expert testimony furnished by defendant's witnesses, and from the official government bulletins in evidence, we learn that detonators such as the one described, con-

O'Hara v. Hines.

structed to be exploded by an application of electricity, are less dangerous to handle than detonators so constructed that they may be discharged by slow burning fuses. The reason assigned is that the explosive substance, mercury fulminate, in the electrical detonators, is covered by a substance put in the cylinder above it, while in the other type of detonator the mercury fulminate is exposed in the cylinder. The testimony also shows that the mercury fulminate may be exploded not only in the ways designed by the manufacturers, but that if hot ashes are dropped into a cylinder where the explosive is exposed it may cause an explosion, or the mercury fulminate may be exploded by a scratch or by friction. It is not inconceivable that in the twisting and pulling of these wires and breaking away of the filling above the mercury fulminate the wires or apparatus intended to convey the electrical current to the explosive substance may have scratched or penetrated it, and that that, rather than the blow upon the rail, caused it to explode. But the exact cause of the explosion does not seem to be controlling.

Defendant also offered testimony from which it may be argued that plaintiff struck the cylinder with a hammer. He is said to have had a hammer in his hand very shortly before the explosion. What is said to be an exploded detonator is also offered in evidence. This exhibit was picked up near the scene of the accident shortly thereafter. It consists of a mutilated copper cylinder and a very small wire, or wires, the ends of which project beyond the cylinder less than an inch. Assuming that this is the exploded cylinder which caused the injury, it is argued that it shows that the wires had been cut off close up to the cylinder, and, therefore, plaintiff could not have been pulling upon the wires to straighten them and use them in the defendant's business, but that he had turned aside from the master's business and was attempting to gratify his idle curiosity in an effort to take the cylinder from the wires. Whatever force there may be in this argu-

O'Hara v. Hines.

ment it was for the jury to say what conclusion they would reach from an examination of the exhibit, together with all the other evidence before them. The testimony of plaintiff and his fellow workman is clear that at the time the cylinder was handed to plaintiff there were several inches of wire attached; that this wire had been crumpled and twisted close to the cylinder. Who can say that an explosion of the force and violence of that which occurred might not have broken off and blown away these several inches of wire that were knotted and twisted at the end of the cylinder? Surely not the court; this, if material, was for the jury.

"In determining whether a peremptory instruction was justified, the party against whom the verdict is directed is entitled to have every controverted question of fact resolved in his favor, and to have the benefit of every inference that reasonably can be deduced from the facts in evidence." *Schmelzel v. Leecy*, 104 Neb. 672.

Defendant filed a special appearance objecting to the jurisdiction of the court over the person of defendant and over the subject-matter of the action, and moved the court to quash the summons theretofore issued, on the ground that certain general orders of the director general of railroads set out as a part of the motion provided that suits against the director general of railroads, as authorized by general order No. 50-A, should be brought in the county or district where the plaintiff resided at the time the cause of action arose. This objection was overruled. It was again urged in the answer, and, by brief filed out of time by leave of court, it is sought to be urged now. But no cross-appeal from the ruling of the trial court was prosecuted by defendant, as required by the rules of this court, and appellee cannot be heard to urge this point now. See subdivision (b) of rule 18 of this court. 94 Neb. XV.

In the briefs on either side counsel have raised many issues not necessary to a determination of the real issues, and in the preparation of this opinion we have not under-

taken to follow them. The issues presented are simple. The statute on which plaintiff's cause of action rests gives him a right of recovery if he is able to prove the allegations of his petition, and the proof offered is of such character and weight that it was for the jury, and not for the court, to determine the issues.

The judgment of the district court is reversed and the cause remanded.

　　　　　　　　　　　　　　　　　　　　REVERSED.