FRED E. BODIE, TRUSTEE, APPELLANT, V. J. LEONARD EPLER ET AL., APPELLEES.

272 N. W. 249

FILED MARCH 26, 1937. No. 29798.

*John J. Ledwith, Herman Ginsburg* and *J. A. Capwell,* for appellant.

*Dwyer & Dwyer, contra.*

Heard before GOSS, C. J., GOOD, EBERLY, DAY, PAINE and CARTER, JJ., and RAPER, District Judge.

EBERLY, J.

This is an action of forcible detainer. It was originally commenced in the county court of Cass county by Fred E. Bodie, trustee, against J. Leonard Epler and Ada A. Epler, to recover possession of a certain farm situated in Cass county, Nebraska. The complaint is in the usual form, seeking a recovery of premises alleged to have been demised to defendants for one year, and the termination of the lease by failure of defendants to pay rental therefor, and service of appropriate notices.

The defendants, in answer, denied each and every allegation of plaintiff's complaint; alleged ownership and occupancy of the premises as their home and homestead by J. Leonard Epler and Ada A. Epler, his wife, defendants, continuously since March 1, 1928. They further allege the conditional settlement of the mortgage indebtedness against said premises by an escrow agreement dated September 19, 1932, the execution and delivery of a warranty deed as required thereby; that the escrow agreement, according to its terms, lapsed at the termination of sixty days after the making thereof; that by fraud and false representations the plaintiff secured the signing of a "correction deed" to replace the deed executed by defendants on October 19, 1932, pursuant to the lapsed escrow agreement, and canceled such former deed; that said correction deed, dated January 29, 1934, though purporting to convey their homestead, was not signed by defendant Ada A. Epler, and was not acknowledged by defendant J. Leonard Epler, was without consideration as to either defendant, and was void; and further challenged the county court's jurisdiction to hear and determine the rights and equities between the parties to the action in this proceeding.

From an adverse decision in the county court, defendants appealed to the district court. There the action proceeded on the pleadings as filed in the county court. A jury was impaneled and a trial of the issues entered upon. At the conclusion of plaintiff's evidence in chief, the trial court sustained the separate motions of the defendants to discharge the jury and dismiss plaintiff's action, because of the insufficiency of the evidence, and because the evidence shows that the question involved in this action is the title to the real estate, and the county court was without jurisdiction to hear and determine said title, and the district court thus acquires no jurisdiction on appeal. From this judgment of dismissal, and the order of the trial court overruling his motion for a new trial, plaintiff appeals.

In determining whether the trial court's action in this case was justified, plaintiff, against whom the judgment was entered, is entitled to have every controverted question of fact resolved in his favor, and to have the benefit of every inference that reasonably can be deduced from the facts in evidence. He is also entitled to the consideration as evidence of all offers of proof which may have been improperly excluded. *Schmelzel v. Leecy,* 104 Neb. 672, 178 N. W. 267; *O'Hara v. Hines,* 108 Neb. 74, 187 N. W. 643.

It appears in this case that at least prior to October 19, 1932, the defendants, husband and wife, were owners of the property in suit, as their home and homestead. The contention of appellant is that defendants, after that date, conveyed the title in fee simple of the premises in suit to plaintiff's *cestui que trust,* and at the time of the original commencement of this action in the county court these defendants were in the occupancy of said premises pursuant to a lease, and that a *bona fide* relation of landlord and tenant then existed between the parties to this litigation.

On the basis of these facts plaintiff contends that the applicable legal principles are: "A lessee who holds over after the expiration of his term is estopped from denying the existence of the relationship of landlord and tenant between himself and his lessor, and may not in an action

for forcible detention attempt to impeach his landlord's title and to assert superior right of possession in himself." In support of the foregoing, the following cases are cited: *Polenske v. Polenske,* 107 Neb. 496, 186 N. W. 530; *Wilson v. Lyons,* 4 Neb. (Unof.) 406, 94 N. W. 636; *Gies v. Storz Brewing Co.,* 75 Neb. 698, 106 N. W. 775; *Hackney v. McIninch,* 79 Neb. 128, 112 N. W. 296; *McAusland v. Pundt,* 1 Neb. 211; *Kouma v. Murphy,* 129 Neb. 892, 263 N. W. 211; *Schroeder v. Bartlett,* 129 Neb. 645, 262 N. W. 447.

In short, the controlling question in this case is: Did the relation of landlord and tenant exist between the plaintiff and the defendants at the commencement of this suit?

It may be conceded that there is an absence of a formal written lease. But, the rule is: "The relationship of landlord and tenant may arise from the implied agreement of the parties, and may be established by proof of circumstances authorizing the inference that the parties intended to assume such relationship toward each other." 35 C. J. 957.

That this principle has been given recognition by this court, may be seen in the following cases:

"Generally, the relation of landlord and tenant is founded upon express contract; but such relation may be presumed from the conduct of the parties in the premises." *Steen v. Scheel,* 46 Neb. 252, 64 N. W. 957.

"The relation of landlord and tenant may be created by implication or by express contract. The law will, in general, imply the existence of a tenancy wherever there is an ownership of land on the one hand and an occupation by permission on the other, for in such cases it will be presumed that the occupant intended to pay for the use of the premises. It will be implied in many cases where there has been no distinct agreement between the parties." *Skinner v. Skinner,* 38 Neb. 756, 57 N. W. 534.

"One in exclusive possession of the real estate of another with the latter's knowledge, in the absence of all evidence on the subject, will be presumed in possession by the owner's permission." *Skinner v. Skinner, supra.*

The following excerpt from *Polenske v. Polenske,* 107 Neb. 496, 186 N. W. 530, may clarify the situation as to the issues under the facts in the instant case:

"If one who is already in possession accepts a lease from a third party, the presumption is that he is yielding the possession which he held under claim of right, and taking possession and holding it thereafter under and by virtue of the lease. * * * Where it is clear that the lessee executed the lease, a justice of the peace may determine all questions as to whether the lessee is wrongfully holding over his term, either by expiration of the term by nonpayment of rent, or by any other breach of the contract which may render his possession unlawful. If the lessee asserts a *bona fide* claim of title, he may still litigate it in the proper forum after he has yielded possession to the lessor. He is not entitled to occupy the inconsistent position of being the owner of the land and at the same time the tenant of another owner."

Taking up now the consideration of the evidence in the record for the purpose of determining the relation of the parties to this litigation, in the light of the principles of law referred to, we find the following situation: Prior to September 19, 1932, the defendants were the owners and occupants of the premises in suit, which were then encumbered by two mortgages aggregating $6,127.50 and interest accrued thereon. On September 19, 1932, defendants, as first parties, entered into a contract in writing with the Federal Trust Company, as second party, with reference to said premises. This contract was duly acknowledged by the several parties thereto on October 19, 1932. It recites the existence of the mortgages above referred to; that "First parties (defendants) feel themselves unable to pay the items due on said loans, hereinbefore described, which fell due July 1, 1932, and feel unable to perform the provisions of said mortgages; and * * * wish to give up said land in consideration for releases of personal liability on said mortgages; and the parties hereto desire to effectuate a settlement thereof; now, therefore, it is mutually agreed

between the parties hereto, as follows: 1. First parties agree to forthwith execute, acknowledge and deliver a warranty deed to the above described real estate conveying the same by full covenants of warranty subject only to the lien of the real estate mortgages hereinbefore described and the taxes; and grantee in said deed shall be blank; and said deed shall be deposited forthwith by first parties with a reputable escrow holder, satisfactory to second party, to be held and delivered in accordance with the provisions of this contract."

By paragraph 2 first parties reserved the right to sell said premises, or furnish a purchaser thereof any time prior to March 1, 1933. By paragraphs 3 and 4 it was provided:

"3. It is further agreed that in the event such a purchaser shall not be obtained by first parties and said deed not be delivered, as provided in the preceding paragraph hereof, prior to March 1, 1933, that then on March 1, 1933, the said escrow holder shall, and he is hereby authorized and directed to, deliver to second party the said warranty deed; and second party is hereby authorized and empowered to insert the name of any person suitable to it as grantee under said deed and to thereby deliver the title to said premises to such grantee; and first parties especially agree that they will vacate said premises and deliver up the possession thereof to second party on or before March 1, 1933, *and that second party* or the grantee by it named, as herein provided, *shall be entitled to* the immediate possession of *said premises on March 1, 1933;* and it is further especially agreed that *first parties release and waive all rights and interest of every nature, including homestead rights,* which they may or might have in or to said premises. (Italics ours.)

"4. It is further agreed that in the event said warranty deed hereinabove described, is delivered to second party, as herein provided, and accepted by it, that first parties shall be released and discharged from all liability on said hereinbefore described real estate mortgages."

Paragraph 5 contained an option for the benefit of the second party which, by its exercise within 60 days, would have secured its discharge from the obligations of this contract.

It appears that neither of the parties exercised their respective options. The contract does not, in express terms, provide that time shall be deemed of the essence of the contract, and it appears that the same never lapsed nor ceased to be in force and effect.

On October 19, 1932, a warranty deed was executed by J. Leonard Epler and Ada A. Epler, and delivered in strict pursuance to such contract. There was also executed and delivered to Ada A. Epler by the second party a release of all claims and demands of every nature, bearing date October 19, 1932; and on the same instrument containing such release, under date of March 1, 1933, signed by Leonard Epler (defendant) is the following: "The said Federal Trust Co., trustee, is hereby authorized to file of record a certain deed signed by J. Leonard Epler and Ada A. Epler, Oct. 19th, 1932."

In the meanwhile the Federal Trust Company became insolvent, and on June 15, 1933, Fred E. Bodie was appointed successor trustee and qualified as such. On August 4, 1933, as such trustee, he mailed a letter to "J. L. Epler," defendant. This letter contained the following: "Will you please advise us by return mail if you are now occupying the land in Cass county, on which you formerly gave a mortgage to the Federal Trust Company. Also please advise us if a lease was ever signed by you and the terms of rental." This letter was returned to the writer, and written thereon was the following: "Plattsmouth, Nebr. Dear Sir: I am still living on the place, and rented it for two-fifths of the crop. Yours Respt. Leonard Epler."

On June 2, 1933, Epler wrote another letter, addressed to the field man of the Federal Trust Company, with reference to a threatened trespass of the Burlington Railway Company on said land, in order that proper steps might be taken by the Federal Trust Company, as owner, or its trustee, to protect its rights.

The two mortgages referred to in the contract have been properly released of record, and these original instruments and the notes secured by the same, being the mortgages and notes settled and satisfied by the terms of the agreement hereinbefore referred to, were enclosed in an envelope, which the evidence in the record indicates was placed in the United States mail for transmission to J. Leonard Epler, the defendant. In addition, releases of mortgages, covering each of the aforesaid mortgages, were duly filed and recorded in the real estate mortgage records of Cass county.

The record further discloses that Mrs. Epler, defendant, in January, 1934, paid $20 "on back rent" for the premises in suit. This testimony was not stricken from the record. However, the trial court wrongfully excluded plaintiff's offer, viz., "We offer to prove by this witness (Bodie) that if permitted to testify he would testify that during the month of January, 1934, the defendant (Ada A. Epler) paid him the sum of $20 to apply on the 1933 rent and agreed to pay the balance of the 1933 rent on or before March 1, 1934."

This witness (Bodie) further testifies that, in the forepart of 1934, he had a conversation with both of the defendants, as follows: "Q. You may state what was said. A. The old barn on the premises was badly dilapidated and Mr. Epler needed a new barn and he had asked me if he could dismantle an old building that was pretty near directly west of the residence property, and I told him that would be agreeable with me. Out of the lumber he wanted to build himself a new barn and he did, and Mrs. Epler asked me if I wouldn't allow them something for the work that they did on the barn and we finally agreed upon the price of $30, to be allowed on the back rental. Q. Did you give them that credit on the rent? A. Yes."

This same witness further testifies that on April 27, 1934, he received the further sum of $57 on the rental of 1933, being the proceeds of "one hundred ninety bushels of corn, sold at thirty cents by Mr. Epler to the Murray Elevator Company." Further, that the taxes on the prem-

ises for the years 1930, 1931, 1932, 1933, and 1934 were paid by plaintiff, who also paid for the insurance on the buildings on the premises.

It also appears that on January 29, 1934, a deed of correction was executed and delivered by the defendants, to be substituted for the deed executed and delivered by defendants on October 19, 1932, which first deed was, by agreement of parties, canceled.

We do not overlook the fact that the testimony of J. Leonard Epler is that this correction deed was not signed by Ada A. Epler, his wife, and was not acknowledged by either his wife or himself. However, this evidence is squarely met by the testimony of the notary public before whom the instrument was executed and by whom the acknowledgment was taken, to the effect that the instrument was signed, executed, and acknowledged by both defendants in his presence. This disputed fact was for the determination of the jury and not the trial judge.

The evidence is uncontradicted that on the 20th or 21st of February, 1934, a representative of the plaintiff called upon the defendants and discussed the rental of the premises to defendants for 1934, as to which the following testimony appears in the record: "Q. You may tell us what was said by Mr. Epler and yourself at that time. A. I told Mr. Epler that I came out there at the request of Mr. Bodie to collect the balance of the rent for the preceding year, and instructed him to sell the corn, the share that belonged to Mr. Bodie, as trustee, and remit the proceeds. Q. Was anything else said, Doctor, about a lease for the year 1934? A. Yes; I was to make a new lease with him for 1934 if he paid up the rent; that is, I told him that Mr. Bodie said that if he would pay the rent that he would lease him the land again for 1934. Q. Just tell us what was said. Finish the conversation. A. I told him that we would have to have more than $75 rent for the pasture because there was too much land there for the amount of money that he was paying, and as the bondholders, or Mr. Bodie, as trustee, would get but very little out of it, and

the taxes and one thing another was such that it would be necessary to have a larger rental, and I told him that he could have the place for the year 1934 upon payment of $125 cash rent, in the place of $75 that he was to have paid for 1933, and two-fifths of the corn delivered to market. Q. What did Mr. Epler say? A. He objected somewhat on the $125 because he said the well wasn't giving as much water as it ought to and he doubted very much whether or not he could run enough cattle in there with the amount of water he had in order to equal the $125, and wouldn't object to it if Mr. Bodie would do something about the well. And I said, 'I have no authority to make any contract about a well or promise anything of that kind.' I said, 'However, I will speak to Mr. Bodie about the well, but the rent will be $125 cash and two-fifths of the corn.' Q. What did he say to that? A. It seemed to be perfectly satisfactory. * * * Q. Now then Doctor, did you later have another conversation with Mr. and Mrs. Epler in the month of March, 1935? A. I did. Q. Who was present at that time? A. Mr. Epler and Mrs. Epler. Q. Now you may state what was said. A. I went out there and told them that I was instructed by Mr. Bodie to collect the rental from 1934. I said, 'I have instructions to accept $100. You owe a balance from 1933, and you owe $125 for 1934, but if you will pay us $100 we will cancel the entire obligation for the cash rental, for the balance of 1933, and the year 1934, and would rent them the land again for 1935. Q. You may state what was said. A. Mrs. Epler stated that they couldn't do it. She said, 'I have $20, and if you will take $20, and cancel what we owe you, I will give you that now, and if you will do that we will rent the land for 1935, and that will give us some opportunity and time to look elsewhere for a location, because we wouldn't like to dispose of our live stock at this time and we have no place to go. Q. Did you accept the $20 in full of the rent for 1934? A. No; I did not. * * * Then shortly I left there and came in to town. Then later, over the telephone, I had a conversation with Mrs. Epler. Q. You

may state what that conversation was. A. She called—I don't know how she knew I was there—but she called me up at Mr. Davis' office, and I happened to be sitting in that gentleman's office there (indicating). I don't remember his name, he is an attorney but he wasn't there, and I was sitting in his office and Mr. Davis called me and I answered the phone and it was Mrs. Epler, and she said, 'Doctor, I have got $20 as I told you before, and I am willing to give you the $20 if you will let us keep the place for the year 1935, and cancel the balance of it,' and I told her, I said, 'Mrs. Epler, I can't do it. I will telephone in to Lincoln to Mr. Bodie, and I am going to relate to him what you have said to me, with reference to the payment of $20, and the terms upon which you lease it again for the next year, and if you don't hear from me again, and if I don't call you up, why you will know that Mr. Bodie will not accept it, and I am going to instruct the attorney to bring ouster proceedings to get possession of the farm.' "

Also, we do not overlook the fact that the correction deed is signed, "Ada A. Reed," though acknowledged as "Ada A. Epler."

The rule is: "The fact that a party's name is misspelled in the signature to a deed will not enable him to avoid the instrument where its execution by him is shown. *This is also true where he has signed by a wrong name.*" (Italics ours.) 18 C. J. 190.

As relating to the general effect of the evidence hereinbefore referred to, the following additional authorities are in point:

"While the presumption of a relationship of landlord and tenant arises from an occupancy of land under an agreement with the owner to pay rent or accompanied by the payment of rent, it is not essential that there be a definite agreement for such payment, and the relationship may arise, although the occupant refuses to agree upon any particular amount or to pay any sum whatever, if he occupies with the owner's permission and with the understanding that rent would be demanded." 35 C. J. 959.

"The burden of proving the relation of landlord and tenant ordinarily rests on the party asserting it. Accordingly, this burden rests on the party asserting the rights of a landlord or the rights of a tenant, as the case may be. If the relation of landlord and tenant is shown to have been created, the burden of proving its termination rests on the party asserting that fact, since the relation, once established, is presumed, within logical limits, to continue. The relation of landlord and tenant may be presumed as a matter of fact from circumstantial evidence as in other cases." 35 C. J. 968.

To show the former existence of the relation of landlord and tenant, and to raise the presumption of its continuance, a lease, the term of which has expired, may be introduced. *Longfellow v. Longfellow,* 54 Me. 240.

It would therefore follow that evidence of a lease terminating March 1, 1934, in the present case, and the actual payment of rent thereunder, as evidencing the existence thereof, would be competent evidence to establish plaintiff's case.

In view of all the evidence in the record, we are of the opinion that at least an issue of fact was established thereby, which was properly for the jury to determine, and in the withdrawal thereof from their consideration the trial court committed reversible error.

Therefore, the judgment of the trial court is reversed and the cause remanded for further proceedings in harmony with this opinion.

REVERSED.